## OKLAHOMA CITY v. BALDWIN.

No. 17581. Opinion Filed April 3, 1928.

Rehearing Denied Dec. 11, 1928.

John Frank Martin, Municipal Counselor, for plaintiff in error.

Ledbetter, Stuart, Bell & Ledbetter, for defendant in error.

HEFNER, J. Rose Baldwin, as plaintiff, sued the city of Oklahoma City, as defendant, for damages, and alleged that one of the trucks of the health department of the city negligently hit the car of the plaintiff and damaged it in the sum of $250; and that she was further damaged personally by the breaking of her arm and wrist which compelled her to pay in nurses' bills, doctor's

fees, and hospital expenses the sum of $500; and that she suffered great pain on account of such injuries and was damaged thereby in the sum of $2,500. The jury returned a verdict in her favor, allowing her $92 for damage to the car, $500 for suffering, and $2,000 for impaired earning capacity and permanent disability.

The first five assignments of error may be considered together, because they raise the same fundamental proposition of law, which may be stated as follows:

"Is a city liable for the acts of a driver of a garbage wagon in the employ of said municipality while performing his duties as such garbage collector, for the reason that the collection of garbage is an act of the city in its governmental capacity as distinguished from its corporate capacity?"

It is fundamental that the acts of a municipality are divided into two divisions, one governmental and the other corporate. If the acts of the agents of the municipality are performed while acting in a governmental capacity for said city, the city is not liable for the negligent acts of its agents, but the city is liable for such acts of its officers or agents when acting in a corporate capacity.

The contention is made that, because the city charged a fee for the removal of garbage, it was acting in its corporate capacity. The facts in this case show that the city did make a charge for such services and that for the year 1925-26 a small profit was made in that department. The previous years show that quite a deficit existed by reason of the operation of this department. We do not think the fact that a city makes a charge for the removal of garbage and rubbish, covering the cost of such removal, necessarily makes such removal a nongovernmental function so as to render it liable for the negligence of a truck driver while engaged in such removal.

A number of the states in the Union have announced the rule that in the collection and disposition of garbage the city acts for the public health and discharges a governmental function. In this regard it is an agent or arm of the commonwealth, and for that reason absolved from liability for the negligence of its employees.

In the case of Janes v. City of Charlotte, 112 S. E. 423, the Supreme Court of North Carolina held that the removal of garbage was a governmental function.

In the case of Manning v. City of Pasadena, 209 Pac. 253, the Supreme Court of California held:

"A city in enacting an ordinance concerning the disposition of garbage and in collecting garbage and disposing of it in a sanitary method was acting within its police powers, and the fact that it sold the garbage after it had been collected at its incinerator, thereby recouping some of the expense of collecting, did not convert the governmental function of collecting into a proprietary function so as to render it liable for the negligence of its garbage collectors."

The Supreme Court of Kentucky in the case of City of Louisville v. Hehemann, 171 S. W. 165, announced the rule as follows:

"In the collection and disposition of garbage undoubtedly the city acts for the public health, and discharges a governmental function. In this regard it is an agent or arm of the commonwealth, and for that reason is absolved from liability for the negligence of its employees."

The Supreme Court of New Jersey in the case of Condict v. Jersey City, 46 N. J. L. 157, said:

"The removal of ashes and garbage placed by the inhabitants in boxes and barrels upon the sidewalks is part of the duties of this board in their supervision over and care for the cleanliness of the streets. * * * To impose upon the corporation liability for the negligence of such employees would indirectly fix upon the corporation a liability from which it is by law, on consideration of public policy, exempted."

To the same effect are the following cases: City of Tuscaloosa v. Fitts (Ala.) 96 So. 771; Jones v. City of Phoenix (Ariz.) 239 Pac. 1030; Love v. City of Atlanta, 95 Ga. 129; Scibilia v. City of Philadelphia (Pa.) 124 Atl. 273; Bruhnke v. City of LaCrosse (Wis.) 144 N. W. 1100.

Numerous cases have been called to our attention which hold that the operation of garbage collectors is a governmental function of the municipality. Our attention has not been called to a single case holding that the operation of garbage collectors is a function of a city in its corporate capacity.

For recovery, the plaintiff relies primarily upon the case of City of Shawnee v. Roush, 101 Okla. 60, 223 Pac. 355. In that case Shawnee operated a municipal hospital. The plaintiff paid the customary charges the same as she would have in a private institution. Under these facts it was held that the city was liable for the negligence of a nurse. So far as the plaintiff was concerned, in that case, the hospital was run on the same basis as if it had been run by a private individual.

The plaintiff also relies upon the case of Oklahoma City v. Foster, 118 Okla. 120, 247 Pac. 80. This case held that the city

has two types of functions, the one governmental and the other corporate. In the Foster Case the city operated a garage for the purpose of repairing motor vehicles used in connection with the police department. It was held, in so far as the repair and maintenance of its motor vehicles was concerned, the city was acting in its corporate or ministerial capacity.

As to whether or not a city in collecting its garbage is acting within its governmental or corporate capacity has never been determined by this court. However, it has been determined by numerous courts of last resort in other states and, in so far as our attention has been called, in every case, it has been held that in such capacity the city acts in its governmental and not its corporate capacity.

Since the adjudicated cases all hold that a city in the collection and disposition of garbage acts for the public health and discharges a governmental function, we are persuaded that we should follow that rule rather than to hold that in such cases the city is acting in its private, corporate capacity.

The judgment of the trial court is reversed, with directions to dismiss plaintiff's petition.

MASON, V. C. J., and PHELPS, LESTER, HUNT, and RILEY, JJ., concur. CLARK, J., dissents.

Dissenting Opinion Filed April 7, 1928.

BRANSON, C. J. (dissenting). At the time the opinion in the instant cause was delivered, the writer announced from the bench that he would file herein his dissent and his reasons for refusing to even discuss or consider the propositions presented by the plaintiff in error, for that former holdings of this court were overlooked. The instrumentality used by counsel for plaintiff in error in presenting his contentions to this court had repeatedly circulated an article slanderous and libelous as to certain members of this court other than the writer, and as to the court itself, an instrumentality of government. The zeal of others similarly bent has caused the injection of the correct name before the public, and it will therefore not be concealed by the writer.

Co-extensive with others is the sworn duty of a judicial officer to protect his court from scurrilous and untruthful assaults against it, as well as the individuals through whom for the time the court functions. Too numerous to tabulate, the principle thus announced is found in the decisions of all English speaking courts. It was expressed by this court (special judges presiding):

"If this court does not defend and protect itself from slanderous charges of the character contained * * * the individual judges would deserve and should promptly receive the contempt of all intelligent and honorable men; for the court which is too weak to demand and enforce decent and respectful treatment cannot expect to secure or retain the respect and confidence of the people." (Opinion by Thompson, J., State v. Martin, 125 Okla. 51, 65, 256 Pac. 667, 680.)

This expression is only a different way of putting what the Supreme Court of the United States said more than 100 years ago. In Anderson v. Dunn, 6 Wheaton, 204, 5 L. Ed. 242, that court said:

"That the safety of the people is the supreme law, not only comports with, but is indispensable to, the exercise of those powers in their public functionaries, without which that safety cannot be guarded. On this principle it is, that courts of justice are universally acknowledged to be vested by their very creation with power to impose silence, respect, and decorum * * * and to preserve themselves and their officers from the approach and insults of pollution. * * * If the laws be not respected, it will be difficult, if not impossible, to execute them. * * * In order to obtain that countenance and support, they must deserve respect, and that court which may with impunity be treated with contempt, will inevitably be contemptible, even in the eyes of the good and the virtuous. Their judgments will not be executed, the law will become a dead letter, and fraud and violence will prevail. It is not the right of the courts only, but it is the right of the people to cause their courts to be treated with respect. It is the **public interest**, and not the **personal** pride of the judges, as suggested at the bar, which claims this power for the courts. As individuals, we **claim** no more respect than our individual characters deserve, but as judges of this court, with the betrayal of our trust, we should become traitors to the people if we did not claim the respect due to a judicial tribunal, and enforce that claim by all the means which the laws allow."

In another case, In re Fite (Ga.) 76 S. E. 397, 420, it is said:

"A judge who, knowing his duty, does not dare discharge it, is **unworthy** of his high office. The judicial ermine should be stripped from him, and he should pass into oblivion."

These brief expressions are but the restatements of the law from time immemorial obtaining in all English speaking countries of the world.

The Writer not Concerned with His
Political Fortune or Misfortune.

The writer is not concerned with his personal political fortune or misfortune, while he serves a commission as a member of this court granted years ago by the people of the state. Politics must not enter the courts in any form. He is concerned, however, in disposing of its business, and in bearing its burdens, even if they be inherited, as here. He is also concerned in preserving the court, the instrumentality to which any citizen may be forced to resort to protect his property or his liberty, and to preserve that instrumentality intolerant of subsidized interests which have had but one purpose in the controversy out of which this situation many months ago grew, and in the making of which the writer had **nothing** to do. (The writer was away when the opinion in the Owens Case went down.) The writer possesses neither bias for, nor prejudice against, any man or firm whose business bears a relation to this court, immediate or remote, whether lawyer or layman. But it does not follow that the writer will tolerate by **passive acquiescence,** or fail to notice, repeated acts by anyone bearing a relation to this court, or the recipient of its consideration, false speech or the premeditated circulation of false and malicious assertions of others. The writer's position in regard to such attacks upon this court or the individual members thereof is not dependent upon whether any other member composing this court for the time affirmatively announces his agreement with his views or not. The writer has no brief, but only denunciation, for the offender, and exercises his right, under the principles above announced, by refusing a consideration of any matter presented through an agency, instrumentality, or firm which, for selfish gain, has deemed it expedient to present by circulation throughout the state the scurrilous attacks of another not justified in fact or law, and at the same time failing to either present the truth or any attempt to state the truth.

### What Are the Facts?

The offending agency through which the plaintiff in error presents its petition in this case is a law brief firm. It is styled "Francis & Holden, Brief Printers." Their place of business is and has been for many years in the capital city. It has **not been made known** to the public that by a custom growing out of convenience to many lawyers, brief printers such as this firm have gradually grown to be the agencies of members of the bar representing litigants who have *honest contentions on which this court should pass* without fear of criticism or intimidation at the hands of any citizen or firm.

It has **not been made known** to the public that this firm, in carrying on its business, has acted as such representative of lawyers, has through its members appeared many times before the writer with applications and requests for courtesies, such as extensions of time to print briefs, and these courtesies have been consistently extended, although not required of the writer by the rules of the court. Such brief printing firms have thereby become agencies through which the contentions of the litigants are presented to this court. The arguments prepared, and as prepared and printed, are filed by them in this court, and become the means through which the litigant, through his counsel, presents his contention to this court, and in turn it is the means by which such firms make money. The instruments they file become a part of the record of the court on which it should have the right to rely. Many times errors have been made in opinions of this court by reason of mistakes, intentional or unintentional, in the mechanism of the brief. In fact, the brief printer, while not a member of the bar, ordinarily is used by the bar as the means through which he *presents his client's case to this the court* of last resort.

Men who thus profit by being intermediaries between litigants and this court in this manner cannot ply their occupation by the writer's consideration of their products, and circulate at the same time in the state false printed matter as to the individuals composing for the time this instrumentality of government.

The writer refuses to be blind to what every one else knows who has any information about the history of this matter. Since November, 1926, a fight, backed with all the propaganda and propagandists that could be employed by money, has been made upon certain members of this court. Its history is found in more than one case. They are in the books as follows: 126 Okla. 86, 258 Pac. 744; 125 Okla. 1, 256 Pac. 340; 125 Okla. 66, 256 Pac. 704; 127 Okla. 85, 260 Pac. 454.

The matter printed by the said firm, Francis & Holden, was in two editions, one in the autumn of 1927, the other mailed March 28, 1928. It was a speech made by Joseph W Bailey, imported by the defendants to represent them in the district court of Oklahoma county, in the case of Riley v. The Tulsa World and O. O. Owens. Those who heard the evidence in this case know the *facts; and they know that the comments* made thereon in the speech are of a nature such as cannot be found in any of the prac-

tices of any criminal barrister of the bowery in any of the crime-polluted sections of any debauched metropolis of the world. The speech made no derogatory reference to the writer hereof. Were such to be found therein, the writer would not resent a personal attack (as it might be so considered). It did, however, to several members of this court, and the court as such. Its whole purpose was conceived in slander and malice against certain members of this court, and the court as an instrumentality of government in Oklahoma, created by the Constitution, adopted by the sovereign citizens of this commonwealth. Its perfidy is found in part in its studied attempt to take matters stated at bar association meetings as jest and presenting them in the said case as serious, weaving around the same imputations against this court and certain former members and certain present members, concluding with invectives and anathemas directed against the court as such. In printing the second edition, the said firm **capitalized** such matter,

The speech also calls in question the right of the plaintiff in said case, under the laws of the United States government, and of this state, to draw compensation as a wounded retired officer of the United States Army. The wounds were received in the Second Battle of the Marne, while he, with others brave in the cause, supported at their own peril, great injury and detriment, the emblem of the authority of this nation, holding aloft its flag in time of gory battle.

No evidence on that question was permitted by the district judge to be presented, yet, contrary to the ethics of any barrister of any bowery, he **refused to abide** the ruling of the trial court, which was by the trial judge during the making of this argument: "The Court: I say you are not permitted to argue to the jury a question of law, where I have excluded it. That is what I mean." Yet in the speech, the article circulated, he undertook to hold an honored member of this court up to the public as avaricious, taking a paltry sum for wounds received on the field of battle, from the handicap of which in the pursuit of his occupation in civil life only the grave will relieve him. Because of this paltry compensation, he is declared therein unfit to be a member of the judiciary of Oklahoma, or to hold a public office at the hands of the electorate of the state. Into this argument, so circulated as aforesaid by Francis & Holden, instrumentalities through which cases are presented in this court, as aforesaid, are shot such expressions as: "The jingle of the guinea helps the hurt which honor feels. * * * He is seeking a cash salve for his wounded vanity.

It is greed, sordid, palpable greed. * * * He is willing to take with one hand the money of the state, and with another hand the money of the federal government, for services which it is not possible for him to perform in behalf of both governments."

Such is a mere sample of the perfidy contained in the article circulated. The idea intended thereby is that no soldier wounded in battle is eligible to hold a public office in this state, and receive the compensation his state pays therefor, because the federal government has recognized the value of his services and the misfortune of his wounds, when he responded voluntarily to the need of the colors, and faced a deadly foe, to be returned to his home and his friends wounded for a lifetime. Nothing more infamous or lacking in rudimentary elements of good citizenship found expression from the lips of any traitor to his government in time of war than this slanderous tirade made by a man imported for the purpose, against an honored member of this court, and against the court itself.

The first edition was paid for. It was so stated by Francis, when he said: "Mr. Francis: We were paid for printing the first edition." To which the writer hereof replied: "I understood you were paid for the first edition, and I overlooked that, however false, libelous, and defamatory you knew it to be. I cannot overlook your reprinting it 'complimentary'." (No answer.)

The writer further stated: "Why did you not print both sides of the controversy 'complimentary'? Why did you not add at the close of this scurrilous speech, say that a judgment was rendered in that case, notwithstanding the speech, finding that the speaker's clients had not introduced one line of evidence, even tending to prove that there was any truth in the libelous matter published in the Tulsa World? Why did you not further print, in the interest of the readers knowing the facts, that one of the defendant's clients had been adjudged guilty by a special court (125 Okla. 52, 256 Pac. 667), and that there was not any evidence to justify the charges there made, and that that special court found: 'The evidence would justify this court in imposing a severe sentence'? Why did you not further cite that in addition to spreading the false propaganda, for which you were paid (the first edition), that another hireling spread false propaganda (127 Okla. 85, 260 Pac. 454), and when he was called before the court to show why he should not be disbarred, he filed an answer, admitting the statements about the member of the court in question (127 Okla. 90, 260 Pac. 457), but that the statements were whol-

ly false and untrue, and **that this lawyer was disbarred?** In the interest of the public knowing the facts, why did you not further state that another one of his propagandists had been suspended? (126 Okla. 86, 258 Pac. 744.)"

In this last cited case therein, the writer hereof pointed out: "The right of free speech and free discussion of judicial determinations is of prime importance under our system and ideals of government. No right thinking man would concede for a moment that the best interest to private citizens, as well as to public officers, whether he labors in a judicial capacity or otherwise, would be served by denying this right of free speech to any individual." The same must be presented, however, so the readers may have some chance to know the facts.

The object of this circulation of a document full of false statements could be only one of slander against an instrumentality of government, the highest judicial tribunal in the state, in carrying out a well-fixed purpose, conceived at the inception of the matter out of which it grew, that this court should be intimidated by the use of money, **BIG MONEY,** to the end that its members would not be free to apply the law, as it is, to the rights of litigants who may be driven here for their protection, which intimidation, if permitted, is a destruction of the constitutional Supreme Court of Oklahoma, without whose protection no citizen would remain in the state longer than he could remove therefrom. To consider any product at the hands of, coming through, or produced by a firm which is a party to such a nefarious purpose, in the first instance for hire, and in the second instance gratuitously, **is to acquiesce in the right to do so,** and as long as the writer is a member of this court—long or short—such products will be thrown into the waste basket when they reach his desk, and treated just as the writer would refuse to listen to any lawyer present a cause in this court who had repeatedly circulated a knowing slander and libel on the court or any member thereof, or judge of any court in this state.