## THOMAS et al. v. REID et al.

No. 19921. Opinion Filed Jan. 21, 1930.

Rehearing Denied March 4, 1930.

Charles R. Alexander and Simons, McKnight, Simmons & Smith, for plaintiff in error.

Burch, Litowich & Royce, O. C. Wybrant, and Bleakmore & Barry, for defendants in error.

ANDREWS, J. The plaintiffs in error were plaintiffs in the trial court and the defendants in error were defendants in the trial court. We will refer to the parties as they appeared in the trial court.

Concretely stated, the facts from which this controversy arose are as follows: The city of Woodward is the owner of an electric light and power plant. Bonds were issued and sold for the installation and construction of this plant and for its improvement from time to time, and it is operated by the city as a public utility. In the month of June, 1928, the defendant Western Light & Power Corporation, being desirous of purchasing this plant from the city of Woodward, procured the city council of the city of Woodward, by resolution, to authorize its mayor to advertise for bids for the purchase of the plant, and pursuant thereto the mayor did advertise for such bids.

Pursuant to that notice the defendant Western Light & Power Corporation submitted its bid in writing for the purchase of the plant, and upon receipt of that bid the city council of the city of Woodward passed ordinance No. 244, and a special election was called by the mayor for the pur-

pose of submitting the question of the proposed sale to the voters of the city of Woodward. That election was held, and it is admitted that at the election 749 votes were cast in favor of the sale and 654 votes against it. At the same election the question of granting a franchise to the Western Light & Power Corporation was submitted to the voters, and that proposition received a majority of the votes cast. Within ten days after the election, the defendant Western Light & Power Corporation filed with the clerk of the city of Woodward its written acceptance of the terms and provisions of the franchise ordinance, evidenced its readiness to pay the consideration for the purchase of the plant upon delivery of title thereto, and requested the city, through its officers, to convey to it the title to the property. A majority of the city councilmen were about to vote to consummate the transaction and complete the sale when the plaintiffs in this action filed this suit and procured a restraining order preventing them from carrying out that intention. At the conclusion of the trial, the court rendered judgment denying a permanent injunction and directing the city of Woodward and its officers to complete the sale, to transfer the plant to the Western Light & Power Corporation, and to execute and deliver to it proper conveyances therefor. From that judgment the plaintiffs appeal to this court.

The record in this case shows that the defendant city of Woodward, since September 6, 1907, has been a city of the first class and its governing body has consisted of a mayor and city council.

The pertinent portions of chapter 94 of the Session Laws of 1927 are as follows:

"Section 1. That no public utility owned by any municipal corporation, organized and incorporated under the laws of the state of Oklahoma, where the cash value of such public utility in a city of the first class exceeds $10,000, or in a town or village where the actual cash value thereof is in excess of $5,000, shall be sold, conveyed, leased, or otherwise disposed of, by the governing body of such municipality, unless such sale, lease, conveyance, or other disposal of such utility shall be authorized by the vote of 60 per cent. of the qualified voters of such municipality, voting at an election to be held for such purpose. * * *

"Section 6. That it is further provided, that the governing body of any city of the first class, organized and incorporated by special charter adopted at an election held for such purpose, when authorized by such charter, may sell, convey, or lease any public utility owned by such municipality operating under special charter without the calling of an election as provided herein."

We quote plaintiffs' contention, as follows:

"It was and is the contention of the plaintiffs that, under the state of facts presented, the procedure was and is governed by the general laws of the state of Oklahoma pertaining to cities of the first class and which, as a necessary conclusion, carries with it the proposition that the sale of this electric light and power plant must have been authorized at an election held in conformity with the provisions of chapter 94, Session Laws of 1927, and at which election 60 per cent. of the qualified electors voting at such election voted in favor of such sale, and it being an admitted fact in this case that less than 60 per cent. of the voters voting at such election voted in favor of said sale, that the proposition necessarily failed."

It was agreed that the only requirement of chapter 94, Id., not substantially complied with was the provision requiring such a sale to be authorized by 60 per cent. of the qualified voters of the municipality voting at the election. The record shows no charge of fraud, inadequate consideration, double dealing, or collusion, and the question presented is purely one of the validity of the sale. The plaintiffs in error in their brief say:

"All parties, in the trial court, addressed themselves to the sole question of the legality or illegality of the proceedings for the sale of this property of the city, and that was the only question involved there, and is the only question involved here."

Many questions presented on this appeal, in our opinion, are immaterial to a determination of this cause, and we will confine our discussion to what we consider to be the determining factor. Plaintiffs "* * * apprehend that no authority will be found to support the contention of the counsel or the finding of the court below that chapter 94, Id., violated any of the constitutional rights of the city of Woodward." We think that there is much authority.

Under the Constitution, section 6, art. 18:

"Every municipal corporation within this state shall have the right to engage in any business or enterprise which may be engaged in by a person, firm, or corporation by virtue of a franchise from said corporation."

Under section 4507, C. O. S. 1921:

"Every municipal corporation within this state shall have the right to engage in any business or enterprise which may be engaged in by a person, firm, or corporation by virtue of a franchise from said corporation, and every city containing a population of more than 2,000 inhabitants shall have

the right and power to acquire, own, and maintain, within or without the corporate limits of such city, real estate for sites and rights of way for public utility and public park purposes, and for the location thereon of waterworks, electric light and gas plants. * * *"

Under the provisions of section 27, art. 10, of the Constitution:

"Any incorporated city or town in this state may, by a majority of the qualified property tax-paying voters of such city or town, voting at an election to be held for that purpose, be allowed to become indebted in a larger amount than that specified in section 26, for the purpose of purchasing or constructing public utilities, or for repairing the same, to be owned exclusively by such city. * * *"

Pursuant to that authority, and in the year 1910, the city of Woodward issued bonds and purchased and acquired the plant involved in this action. At the time of the trial there was outstanding bonded indebtedness incident to the purchase and operation of the plant to the amount of $52,500.

Under section 4510, C. O. S. 1921:

"All cities governed by the provisions of this chapter shall be bodies corporate and politic, and shall have the power to sue and be sued, to purchase and hold real and personal property, for the use of the city, to sell and convey any real or personal property owned by the city, and make such order respecting the same as may be conductive to the best interests of the city, to make all contracts and do all other acts in relation to the property and affairs of the city, necessary to the good government of the city, and to the exercise of its corporate and administrative powers, to have and use a corporate seal and alter the same at pleasure, and to exercise such other and further powers as are, or may be, conferred by law."

And under section 4511, C. O. S. 1921:

"The powers granted to and conferred upon cities shall be exercised by the mayor and council, or other governing body, of such cities, as provided by law."

Under these provisions the mayor and council of a city of the first class, acting for the city, has authority to purchase or otherwise procure, and to operate when procured, a plant such as is involved in this action.

The particular question to be answered here is: Did the city have authority to sell the plant without the consent of 60 per cent. of the qualified voters thereof voting at an election held for that purpose?

Section 2, art. 18, of the Constitution reserved to every municipal corporation "* *

* all of its present rights and powers until otherwise provided by law. * * *" Among those rights and powers was the right to sell a light plant. Section 4510, Id. We quote from Dix v. Port of Port Orford 282 Pac. 109, wherein the Supreme Court of Oregon said:

"As a general rule, the power of a municipality to convey property is equal to its power to acquire it. At common law a municipal corporation, unless restrained by its charter, could dispose of property in the same manner as private individuals. 19 R. C. L. 772. In the instant case, we do not think that the property acquired through purchase was dedicated to a public use. True, it inured to the benefit of the public, but the port was engaged in this commercial enterprise for profit, as a toll was charged any shipper who used the wharf or docking facilities. It was not open to indiscriminate use by the public. In the maintenance and operation of this property, the port was acting in a proprietary capacity. Esberg Cigar Co. v. Port, 34 Ore. 282, 55 Pac. 961, 43 L. R. A. 435, 75 Am. St. Rep. 651. It held title to property which had been acquired for strictly corporate uses. City National Bank v. Kiowa, 104 Okla. 161, 230 Pac. 894, 39 A. L. R. 206, note. It is not a case of holding title to property in trust where there has been a dedication to a public use. It is not analogous to streets or to public highways. Due to changed conditions, the board of commissioners, in the exercise of their discretion, determined that this property was no longer adapted to the purpose for which it was originally intended, and that the best interest of the taxpayer would be subserved by disposing of the same. In our opinion the lower court erred in concluding that the port was exercising a governmental function in the maintenance and operation of this dock and wharf"

—and from Yarbrough, Mayor, v. Donaldson, 67 Okla. 318, 170 Pac. 1165, wherein this court said:

"The city, by the resolution providing for the sale of its electric light plant, was not exercising a legislative function, but was administering a law already made, to wit, section 541, supra (sec. 4510, C. O. S. 1921), giving it the power to dispose of its property."

Section 2, art. 18, Id., also provides that a city "* * * shall always have the additional rights and powers conferred by this Constitution."

In Lackey v. State ex rel., 29 Okla. 255, 116 Pac. 913, this court in construing section 2, art. 18, Id., said:

"* * * but the foregoing section adds to these rights, which shall continue to exist

until otherwise provided by law, the rights and powers provided by the Constitution."

Among those rights and powers is the right to engage in business, the right to local self-government, and the right to majority rule.

This court in the first paragraph of the syllabus in Moomaw v. Sions, 96 Okla. 202, 220 Pac. 865, said:

"A municipal corporation engaged in the operation of a system of electric lights exercises business and administrative functions rather than those strictly governmental, and is governed largely by the same rules applicable to individuals or private corporations engaged in the same business."

It would appear that the Legislature is without authority to deprive municipal corporations of the right to engage in business, and as a necessary adjunct thereto to acquire property necessary for the operation of a light plant or to sell such property when it considers such a sale advisable, but it is not necessary for us to decide that question, since the Legislature has not attempted to prohibit the sale of light plants. Chapter 94, Id., appears to limit this right by requiring a sale thereof to be to a franchise holder. Since the purchaser in this case is a franchise holder, the validity of that restriction is not in issue, and that question is not here decided.

This court is of the opinion that the Legislature has authority to provide a procedure for the sale of public utilities and that chapter 94, Id., is a valid enactment in so far as it provides a procedure for the sale thereof. There is nothing therein that deprives a municipality of its rights to sell a public utility. The chapter contains no repealing clause and there is nothing in it to indicate an intent to repeal section 4510, Id. Section 6 of the chapter provides for a sale by certain cities. It was evidently the purpose of the Legislature, not to deprive a municipality of the right to sell its public utilities, but to take that power from the governing body of the municipality and to place it in the people of the municipality. To that extent it is a valid enactment. Had the act contained no provision requiring a majority of 60 per cent. of the qualified voters voting at an election, we would have no hesitancy in holding it to be both constitutional and controlling.

An analysis of our Constitution discloses a clear intent for majority rule. Section 1, art. 2, provides that:

"All political power is inherent in the people; and government is instituted for their protection, security and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it: Provided, such change be not repugnant to the Constitution of the United States."

Section 3, art. 5, provides that a measure initiated or a measure referred shall be in force when approved by a majority of the votes cast thereon; section 5 (a) of art. 5, relates to the abolishment and reinstatement of township government and provides for an election and majority vote; section 3 (a) of art. 18 provides for the granting of charters by majority vote; section 4 (c), art. 18, provides for municipal initiation by majority vote; section 4 (d), art. 18, provides for municipal referendum by majority vote; section 5 (a) and (b), art. 18, provides for the granting of franchises by majority vote; section 1, art 24, provides for amendment to the Constitution by majority vote; section 2, art. 24, provides for the calling of a constitutional convention by majority vote; section 10, art. 10, provides for an increase of tax rates by majority vote and section 27, art. 10, authorizes the incurring of indebtedness by majority vote.

There is only one constitutional provision requiring other than a majority vote and that is section 26, art. 10, which requires the vote of three-fifths of the voters voting at an election to authorize the incurring of an indebtedness to an amount exceeding in any year the income and revenue provided for such year.

The Constitution clearly discloses the purpose of the people to reserve to themselves the right to determine any question that they can determine under the provisions of the Constitution by a majority vote except only as limited by section 26, art. 10. The purpose of that requirement is clearly to prevent the incurring of indebtednes in excess of income and revenue and has no application to the facts in this case.

This court in Williams v. City of Norman, 85 Okla. 230, 205 Pac. 144, held an act requiring the approval of more than 50 per cent. of the qualified property tax-paying voters of the city voting at an election to authorize the increasing of an indebtedness under the provisions of section 27, art. 10, of the Constitution, to be unconstitutional as a curtailment of the grant of power given to the municipality by virtue of that section. and in the syllabus said:

"The Legislature of this state has no power to abridge or extend, by construction or otherwise, a provision of the Constitution of this state which is a self-executing grant of power to the qualified property tax-paying

voters of a city or town, where such a constitutional provision is complete in itself."

This court in State ex rel. Caldwell v. Hooker, County Judge, 22 Okla. 712, 98 Pac. 964, in discussing the effect of legislation, said:

"Such legislation, however, must be in harmony with the spirit of the Constitution, and its object to further the exercise of constitutional right and make it more available, and such laws must not curtail the rights reserved, or exceed the limitations specified."

The inconsistency in chapter 94, Id., appears when we consider section 6 thereof, which provides for a sale without an election by cities operating under a charter, when authorized by such charter. A majority of the voters voting at an election may adopt a charter (section 3 (a), art. 18, of the Constitution); that charter supersedes all laws of the state in conflict therewith in so far as such laws relate to purely municipal affairs (Caruth, Mayor, v. State ex rel., 101 Okla. 93, 223 Pac. 186); and when such a charter is adopted no election is necessary to authorize such sale (section 6, Id.). In other words, a majority of the voters voting at an election for a charter may obviate the necessity of an election authorizing a sale, but if there is no charter, then, under the provisions of this act, 60 per cent. of the voters voting at an election are necessary before a sale is authorized. The effect of this is to require a larger majority to authorize a sale than is required to adopt a charter which in itself authorizes a sale. It appears to us that, since the Constitution authorizes the adoption of a charter by a majority vote, any municipal action that can be authorized by a charter may be authorized by a majority vote without a charter.

The principle of majority rule is one of the foundation stones of our government. The principle is laid down in 6 R. C. L. 43, as follows:

"It has been said that no government is republican in form which fails to secure the purity of elections, and it has been stated that the principle of majority rule is at the foundation of systems of government of a republican form"

—and in McQuillin on Municipal Corporations, sec. 246, as follows:

"The right of local self-government, as an undoubted right of the people, is regarded as an inseparable incident to our republican form of government, and, therefore, all our Constitutions assume its continuance. As expressed in substance by Judge Cooley, all 'delegations of powers which they make, and the express and implied restraints which

they impose' upon the several departments of government are to be always construed in the light of all recognized pre-existing rights and privileges of the people, either in their individual, or aggregate capacity as a local community.

"The Legislature cannot take away from the people of a town or city rights and privileges which they possessed as citizens of the state before the incorporation unless such rights have been expressly surrendered by organic provisions. As heretofore pointed out, the principal object of incorporation is to enable them to supply local needs and conveniences, or, additional rights and powers are granted to enable them better to govern themselves in all matters of local concern, and not to take away any rights or privileges they possessed before such grant was made."

The Supreme Court of Michigan in Maynard v. Board, 84 Mich. 228, 47 N. W. 756, said:

"The Constitution is the outgrowth of a desire of the people for a representative form of government. The foundation of such a system of government is, and always has been, unless the people have otherwise signified by their Constitution, that every elector entitled to cast his ballot stands upon a complete political equality with every other elector, and that the majority or plurality of votes cast for any person or measure must prevail. All free representative governments rest on this, and there is no other way in which a free government may be carried on and maintained. That the majority must rule, lies at the root of the system of a republican form of government no less than it does in a democratic. * * * It is the constitutional right of every elector, in voting for any person, to represent h'm in the Legislature, to express his will by his ballot; and such vote shall be of as much influence or weight in the result, as to any candidate voted for, as the ballot and vote of any other elector. * * *

"What difference in principle or in result is this law, which permits one elector to cast more than one vote for a candidate, from the act of the person who stuffs a ballot box with more votes for a particular candidate than there were electors voting for him? The only difference is that in one case the will of the majority is overcome and defeated under the forms of law, and in the other without law. Both are frauds upon the rights of the majority of the electors; both alike strike down the constitutional safeguards of the people; both are subversive of a free representative government."

In State ex rel. Smyth v. Moores, 76 N. W. 175, the Supreme Court of Nebraska, in the third paragraph of the syllabus, held:

"The right of local self-government in cit-

ies and towns (i. e., the power of the citizens thereof to govern themselves, as to matters purely local in their nature, through officers of their own selection) existed in this state at the time the present Constitution was framed, and was not surrendered upon the adoption of that instrument, but is vested in the people of the respective municipalities, and the Legislature is powerless to take it away."

The court quotes with approval from Rathbone v. Wirth, 6 App. Div. 277, 40 N. Y. Supp. 535, as follows:

"Under our form of government that supreme power is vested in and exercised by the majority, and for all practical purposes the majority are the people. The principle that the majority shall govern lies at the very basis of our government. * * * The Legislature exercises the legislative power of the people. It is their agent for that purpose. But it cannot limit or surrender any * * * of its principles. But it may be said the Legislature is composed of the representatives of the people, and that, therefore, their acts are presumed to be the acts of a majority of the people, and that, while this act deprives the majority of the people in one locality of their power, still it is in accordance with the will of the majority of the people of the whole state, and that thereby the principle of majority government is recognized. There would be force in that suggestion if it was not for another principle of our government recognized by our Constitution, and if the people had not by the Constitution limited their power to override the will of a majority in any locality. The principle I refer to is the principle of local self-government. * * * Local self-government is the school which fits people for self-government. Local self-government is the result, and also the most efficient preserver, of civil liberty. * * * The principle is one that runs through our entire system of government, from the road and school district up to the federal government. * * *"

Nor is it necessary for us to point to any particular constitutional provision that is violated. Section 33, art. 2, of the Constitution provides:

"The enumeration in this Constitution of certain rights shall not be construed to deny, impair or disparage others retained by the people."

McQuillin on Municipal Corporations, sec. 246, provides:

"The above views lead to the inevitable conclusion that there are implied restrictions on the power of the Legislature as to interfering with the right of local self-government as it is understood and as it has been exercised in this country from the earliest time. Therefore, in order to invalidate a legislative act which denies or restricts such

right, it is unnecessary to point out the express words of the Constitution that have been violated. 'Some things are too plain to be written,' as the Supreme Court of Michigan once declared, and this is one of them."

In Citizens Savings & Loan Association v. Topeka, 20 Wall. (U. S.) 662, it was said:

"It must be conceded that there are such rights in every free government beyond the control of the state. * * * There are limitations on such power which grow out of the essential nature of all free governments; implied reservations of individual rights, without which the social compact could not exist and which are respected by all governments entitled to the name."

The rule is stated in 6 R. C. L., page 47, as follows:

"It is therefore an established canon of constitutional construction that no one provision of the Constitution is to be separated from all the others, and to be considered alone, but that all the provisions bearing upon a particular subject are to be brought into view and to be so interpreted as to effectuate the great purposes of the instrument."

Mr. Justice Cooley, in People v. Harding, 53 Mich. 485, 19 N. W. 155, in seeking for the real meaning of a Constitution, said:

"We must take into consideration the times and circumstances under which the state Constitution was formed,—the general spirit of the times, and the prevailing sentiments among the people. Every Constitution has a history of its own, which is likely to be more or less peculiar; and unless interpreted in the light of this history is liable to be made to express purposes which were never within the minds of the people in agreeing to it. This the court must keep in mind when called upon to interpret it; for their duty is to enforce the law which the people have made, and not some other law which the words of the Constitution may possibly be made to express."

And Judge Cooley, in his valuable work on Constitutional Limitations (5th Ed.) page 203, said:

"It does not follow, however, that in every case the courts, before they can set aside a law as invalid, must be able to find in the Constitution some specific inhibition which has been disregarded, or some expressed command which has been disobeyed."

The Nebraska case from which we have quoted construed a Constitution of which that court said:

"There is no express provision in the Constitution of this state which gives municipal

corporations the power to select their officers, or to manage their own affairs * * *"

—and in its construction thereof said:

"An act violating the true intent and meaning of the instrument, although not within the letter, is as much within the purview and effect of a prohibition as if within the strict letter; and an act in evasion of the terms of the Constitution, as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purposes, is as clearly void as if in expressed terms forbidden. A thing within the intent of a Constitution or statutory enactment is, for all purposes, to be regarded as within the words and terms of the law."

And that court quoted with approval from Rathbone v. Wirth, 150 N. Y. 459, 45 N. E. 15, as follows:

"When the validity of such legislation is brought in question, it is not necessary to show that it fails appropriately within some express, written prohibition contained in the Constitution. The implied restraints of the Constitution upon legislative power may be as effectual for its condemnation as the written words, and such restraints may be found either in the language employed or in the evident purpose which was in view, and the circumstances and historical events which led to the enactment of the particular provision as a part of the organic law"

—and from the first Rathbone Case cited, as follows:

"There are some things so contrary to the entire purpose and spirit of the Constitution that they must be said to be in conflict with it, although they cannot be contrasted with any specific portion of it."

In Maynard v. Board, supra, it is said:

"This prohibition is implied from the system of representative government provided for in that instrument. * * * No one would contend that a law declaring the person who received the least number of votes selected to an office to be a constitutional and valid law, and yet we cannot lay a finger upon the clause prohibiting in turn such legislation. It is true the Constitution does not prohibit the Legislature by express language from concocting some scheme by which the equality of the electors in the choice of representatives may be impaired or defeated. * * * It requires no argument to show that such legislation would defeat the object of the elective franchise, which is that every elector's franchise is of equal value to every other elector, and it would subvert the will of the people as expressed through the ballot."

The Supreme Court of Iowa, in State ex rel. White v. Barker, 89 N. W. 204, said:

"The argument is that the intention to preserve and perpetuate the ancient right of local self-government, which the law recognizes as of common-law origin, and having no less than common-law franchises, is apparent throughout the scope of most American Constitutions. Some of the judges even go so far as to say 'that, local self-government having always been a part of the English and American system, we shall look for its recognition in any such instrument (Constitution); and, if not expressly recognized, it is still to be understood that all these instruments are framed with its present existence and anticipated continuance in view'; 'that back of all Constitutions are certain usages and maxims that have sprung from the habits of life, mode of thought, methods of trying facts, and mutual responsibilities in neighborhood interests; precepts that have come from revolutions which overturned tyrannies; sentiments of manly independence and self-control, which impelled our ancestors to summon the local community to redress local evils, instead of relying upon king or Legislature at a distance to do so; that form the living spirit of the lifeless skeleton known as the Constitution; that gives it force and attraction, and that distinguishes it from the numberless so-called Constitutions of Europe; and that this so-called living spirit should supply the interpretation of the words of the written charter.' * * *

"We have already called attention to the dual nature of municipal corporations, and have discovered that with respect to private and proprietary rights and interests they are entitled to constitutional protection. It is quite clear that the establishment and control of waterworks for the benefit of the inhabitants of the city is a matter that pertains to the municipality, as distinguished from the state at large. Dill, Mun. Corp., sec. 58; Proprietors of Mt. Hope Cemetery v. City of Boston, supra; Western Sav. Fund Soc. v. City of Philadelphia, supra; City of Kansas City v. Marsh Oil Co., 140 Mo. 472, 41 S. W. 943. In President, etc., of City of Paterson v. Society for Establishing Useful Manufactures, 24 N. J. Law, 385, it is held, in substance, that a municipal corporation exercising powers conferred, not for public purposes, but for its private benefit and emolument, will be regarded quod haec as a private corporation. See, also, Town of Montpelier v. Town of East Montpelier, 29 Vt. 12, 67 Am. Dec. 748; Atkins v. Town of Randolph, 31 Vt. 226; Dartmouth College v. Woodward, 4 Wheat. 694, 4 L. Ed. 629; City of Detroit v. Detroit & H. P. R. Co., 43 Mich. 140, 5 N. W. 275; Helena Consol. Water Power Co. v. Steele, 20 Mont. 1, 49 Pac. 382, 37 L. R. A. 412; City of Newport v. Horton (R. I.) 47 Atl. 312, 50 L. R. A. 330; City of Louisville v. President, etc., of University, 15 B. Mon. (Ky.) 642; Town of Milwaukee v. City of Milwaukee, 12 Wis. 94."

In Caruth v. State ex rel., supra, this court held that the power to create carries with it the power to destroy, and said:

"Respondent next argues that when a free-holders' charter has once been adopted and it has become the organic law of the city, the same may not thereafter be entirely abrogated or repealed. This, if true, * * * would deprive the people of municipalities of the right of local self-government."

This reasoning applies to the case at bar. It is here argued that, while a majority of the voters voting at an election may impose a tax upon the property in a municipality for the purpose of constructing a light plant, when the light plant is once constructed it requires 60 per cent. of the voters voting at an election to sell the same and pay off the indebtedness against the property. If this were true, the right of the people of the city of Woodward to self-government would not only be infringed upon, but authority would be given to 41 per cent. of the voters voting at an election to prevent the retirement of an indebtedness which 49 per cent. of the voters voting at an election could not prevent being incurred.

This court has given earnest consideration to the opinion in City National Bank v. Incorporated Town of Kiowa, 104 Okla. 161, 230 Pac. 894. There the town of Kiowa, prior to the adoption of chapter 94, Id., by action of the governing body and with the approval of the voters voting at an election, had entered into a contract for the sale of a light plant. The purchaser mortgaged the property and defaulted in payment of the indebtedness. An action was brought to foreclose the mortgage, and this court held:

"It is therefore concluded that the municipal authorities of the incorporated town of Kiowa had no constitutional or statutory authority, either express or implied, to sell unconditionally the municipally owned water and light plant. It is further concluded that by virtue of the referendum elections they were authorized to enter into the contract which was made with the Kiowa Water Works, Light & Power Company, but that such contract did not authorize that company to mortgage or otherwise convey the property except as provided in section 11 of Ordinance No. 103, which limitation was accepted in writing by the company, and is binding on it and on all persons claiming under it. This acceptance is explicitly recited in the face of the deed and of the bill of sale on which plaintiff relies. * * *

"The judgment of the trial court should have been in favor of plaintiff for foreclosure of its mortgage and for a sale of the property burdened with the condition that it be operated as a public utility as originally contemplated in the bond issue for its construction."

The reasoning in that case is in direct conflict with that in Yarbrough v. Donaldson, supra, and that case was not mentioned therein. The conclusion reached in both cases was the same. We call attention to the Kiowa decision for the reason that the facts shown by the record in this case conform to the statements therein made. Here there is no attempt to convey the property free from public use. The record shows that the proposal of the Western Light & Power Corporation provided that:

"It is contemplated by this proposing party that in the event this proposal is accepted and sale made and said franchise granted, to maintain and operate within the limits of the city of Woodward an electric light and power generating plant of sufficient size and capacity to adequately serve the said city of Woodward and its inhabitants and to furnish a first class 24-hour a day service of electrical power and energy in such quantities as the said city of Woodward and its inhabitants shall require for light, heat and power purposes."

And the franchise granted to that company provided that any assignment thereof would be subject to the provisions thereof. The proceeds of the sale are sufficient to retire all outstanding bonded indebtedness and leave a surplus. The record shows that the transfer of the property will not deprive the consumers of any right. The sale was authorized by majority vote. There is nothing in the Kiowa decision that conflicts with the rule herein announced.

It is our opinion that chapter 94, Id., in so far as it requires a sale, lease, conveyance, or other disposal of a public utility to be authorized by a vote of 60 per cent. of the qualified voters of the municipality voting at an election held for such purpose, is unconstitutional and void. The remainder of chapter 94, Id., was complied with by this municipality.

Since a majority of the qualified voters of the city of Woodward voting at an election held for that purpose have authorized the sale of its light plant to a franchise holder who agrees to continue the operation thereof, and since the sale proceedings were in conformity with the valid procedure prescribed by the Legislature, and since there was no fraud, double dealing, or collusion in the same and the consideration therefor was adequate, the right of the people must prevail, and the judgment of the trial court in denying the prayer of plaintiffs and directing the municipal officers to complete

the sale authorized by the people is in all things affirmed.

MASON, C. J., LESTER, V. C. J., and CLARK, HEFNER, and CULLISON, JJ., concur. SWINDALL, J., disqualified, HUNT, J., absent, and RILEY, J., concurs in conclusion.