Leonard L. MEDER, Plaintiff,

v.

CITY OF OKLAHOMA CITY, a municipal corporation, Sheldon L. Stirling and Philip J. Rhoads, Trustees of the Oklahoma City Development Trust, the Oklahoma City Development Trust, a trust, and the First National Bank and Trust Company of Oklahoma City, Defendants.

James R. Huggins, Intervenor.

No. 38923.

Supreme Court of Oklahoma.

March 23, 1960.

Dissenting Opinion March 28, 1960.

Supplemental Opinion and Rehearing Denied April 5, 1960.

Withington, Shirk, Nichols & Work, by George H. Shirk, Oklahoma City, for plaintiff.

Edward H. Moler, Municipal Counselor of City of Oklahoma City, George J. Fagin, Norman E. Reynolds, Jr., Oklahoma City, for defendants.

Merton M. Bulla, Baker H. Melone, and Paul Johanning, Bulla, Melone, Meister & Sheehan, Oklahoma City, for intervenor, James R. Huggins.

State Department of Commerce and Industry, by L. D. Melton, Oklahoma City, amicus curiae.

JACKSON, Justice.

This is an original action for injunction filed in this court by Leonard L. Mcder, a resident taxpayer and owner of property in Oklahoma City, for himself and all other

taxpayers of Oklahoma City similarly situated. The action is against The City of Oklahoma City, a municipal corporation; Sheldon L. Stirling and Philip J. Rhoads, Trustees of the Oklahoma City Development Trust; The Oklahoma City Development Trust, a trust; and The First National Bank and Trust Company of Oklahoma City, as defendants.

After the action was filed James R. Huggins, a resident owner of property and taxpayer, and patron of city sewer and garbage services, hereinafter called intervenor, was permitted to intervene as a party plaintiff for himself and all others similarly situated.

In view of the urgency and importance of the matters involved both to the defendant City of Oklahoma City and other cities of the State of Oklahoma we have concluded to accept original jurisdiction.

From the exhibits attached to plaintiff's petition it is established that on January 2, 1958, Edgar R. Oppenheim, as trustor, and Sheldon L. Stirling and Philip J. Rhoads, as trustees, entered into a trust indenture. By the terms of the trust indenture Edgar R. Oppenheim created the trust for the use and benefit of The City of Oklahoma City, Oklahoma, and for public purposes set forth in the indenture, under the provisions of 60 O.S.1951 §§ 176–180, inclusive, and as amended in 1953.

The purpose of the trust, as set forth in the trust indenture, is generally to (1) finance water mains and extensions; (2) to acquire, construct, purchase, repair, remodel and operate buildings and other facilities for use by the United States of America, or the State of Oklahoma, or for use by agencies of the United States, of the State of Oklahoma, or any municipality thereof; and (3) to establish, construct and enlarge and administer utilities, within and without the territorial boundaries of Oklahoma City, which are or shall be of public use; and (4) to service machinery and equipment in connection with such utilities, buildings and facilities; all or any of which being subject to the approval by ordinance of the City Council of Oklahoma City.

In order to perform the foregoing purposes the trustees, by the trust indenture, are given practically unlimited power to do all things necessary to perform those functions. The trust shall have duration for the term of duration of the beneficiary unless sooner terminated.

The trust estate will consist of funds and property presently in the hands of the trustees and any properties, leasehold rights, money, and all other things of value coming into the possession of the trustees pursuant to the trust indenture, and the West 5 feet of Lot 29, Block six, replat of Industrial Boulevard Addition to Oklahoma City.

On January 7, 1958, by Ordinance No. 8158, the City Council acknowledged that the trustor, Edgar R. Oppenheim, had conveyed the west 5 feet of Lot 29 (above described) to the trust, accepted the terms of the trust indenture, and agreed to become the beneficiary.

Thereafter, and on August 26, 1959, the City Council by Ordinance No. 8645, authorized and approved a lease agreement between the City of Oklahoma City, as lessor, and the trustees of the Oklahoma City Development Trust, as lessee. In the lease agreement it was pointed out that Oklahoma City had grown in area from approximately 80 square miles to approximately 225 square miles during the past year, and that there was a need for extending and improving the sanitary sewer system and for acquiring garbage and trash disposal installations.

The lease conveys and assigns to trustees all the presently existing sanitary sewer system including sanitary sewage collection, transportation, processing and disposal system and equipment and accessories appertaining thereto presently belonging to the City, together with its custody, management or control, together with all rights-of-way, real estate, and interests therein, licenses, easements, and other rights and privileges related thereto. It also includes all proceeds, fees, charges, revenues, rents and profits from the use of the sanitary

sewer system, together with any additional properties and income therefrom hereafter acquired.

The term of the lease is for thirty years from September 1, 1959, and until all indebtedness hereinafter authorized by the trustees and the City Council has been paid.

It is further agreed in the lease that the trustees will issue bonds for the purpose of extending and improving the sanitary sewer system and for the construction of garbage and trash disposal installations, to be paid for as set forth in the lease and bond indenture.

Under the lease the lessee is to operate all of the leased properties and fix such rates, fees and charges as shall be sufficient to meet interest and reserve requirements for the bond or bond issues, for bank and trustees fees, and other expenses. Ordinance No. 8645 in approving the lease provides that the trustees will secure prior approval of the City Council as to the amount of any uniform rate, fee or charge to be imposed by trustees.

All extensions and improvements to the sewer system and garbage and trash disposal installations that are paid for from the sale of trustees bonds are deemed personal property, and title thereto shall be vested in the trustees until the indebtedness of the trust is paid in full, under the terms of the lease.

Any surplus revenues over and above that required to pay the trustees bonds and interest, bank fees and trustees expenses, will be turned back to the City.

The lease agreement was approved by Ordinance No. 8645, dated August 26, 1959.

On September 1, 1959, the trustees of the Oklahoma City Development Trust entered into a $6,500,000 bond indenture to obtain funds for an extension of the sewer system and for garbage disposal facilities as provided for in the lease. By this indenture the trustees assign and pledge to The First National Bank and Trust Company of Oklahoma City the sanitary sewer facilities and garbage and trash disposal installations and equipment to be constructed

from the proceeds of the bond issue, including all revenues therefrom. Also assigned and pledged is the trustees leasehold interest in the presently existing sanitary sewer system of the City and revenues therefrom. This bond issue was approved by Ordinance No. 8729 on November 10, 1959.

When the bonds, interest and bank charges, trustees expenses, and all other expenses, together with any additional bonds issued by the trustees and approved by the City Council have been paid, the property, together with any extensions thereof will be turned back to the City and the lease will be at an end.

Plaintiff and intervenor both contend that the lease agreement is void because the City has no power to lease its public utilities without first having submitted the question to a vote of the people as required by 11 O.S.1951 § 441 et seq., as amended in 1953. They also invite our attention to Thomas v. Reid, 142 Okl. 38, 285 P. 92; Lewis v. City of Seminole, 200 Okl. 414, 195 P.2d 267, 11 A.L.R.2d 166; and Robinson v. Hal Johnson & Co., 206 Okl. 397, 243 P.2d 657. These cases have been carefully examined and in the first two cases cited it does not appear that those cities were operating under a charter. In any event, it was not so contended. In the Hal Johnson case the city was a charter city but the lease involved an abandoned airport.

Oklahoma City is a "charter city", and section 1, Article 1, of its charter provides that the City shall have power to lease, convey, and otherwise dispose of its property. Article 2, Section 19, gives all legislative power to the City Council, with certain exceptions not involved herein.

Since Oklahoma City is a charter city and has the power to lease and otherwise dispose of its property, we think the holding of this court in Yarbrough v. Donaldson, 67 Okl. 318, 170 P. 1165, is, by analogy, quite in point. That case was decided in 1918 and prior to the adoption of 11 O.S. 1951 § 441 et seq. Therein the plaintiff,

Donaldson, sought a mandamus against the Mayor of Durant, Oklahoma, requiring the Mayor to file a referendum petition and call an election on the proposition of whether the city would cease to operate its electric system and would enter into a contract with a public utility company for such company to supply electricity for stores and business houses for a period of seven years, and giving the city an option to sell its light plant to the company within three years.

In the Yarbrough case the court quoted Section 541 R.L.1910 (11 O.S.1951 § 568), wherein it is provided that "All cities governed by the provisions of this chapter * * * shall have the power * * * to sell and convey any real or personal property owned by the city, * * *." [67 Okl. 318, 170 P. 1166.] In discussing the quoted section it was pointed out that municipalities cannot dispose of property of the character there involved without proper legislative authority. After citing Dillon on Municipal Corporations and Article 18, § 4(a), Oklahoma Constitution, which gives the people of cities a right to invoke the initiative and referendum with reference to all legislative authority which it may exercise, the court said:

"The city, by the resolution providing for the sale of its electric light plant, was not exercising a legislative function but was *administering* a law already made, to wit, section 541, supra, giving it the power to dispose of its property." (emphasis supplied).

The Yarbrough case was cited with approval and quoted to some extent in Thomas et al. v. Reid et al., supra.

█ Since Section 1, Article 1, of the Charter of Oklahoma City gives the City the power to lease its property, and Section 19, Article 2, of the charter gives the City Council all legislative power, and there being no contention that the plaintiff or the intervenor seek, or have sought, any relief under the Initiative and Referendum provisions of the Oklahoma Constitution, we must conclude that the City Council was authorized to execute the lease in question without first having submitted the question to a vote of the people, irrespective of whether the City Council was acting in a legislative or administrative capacity. Since the Oklahoma City charter authorizes its governing body to lease the properties of the City 11 O.S.1951 § 441, as amended, does not apply. 11 O.S.1951 § 446, specifically so provides.

It is further contended that the trust indenture, bond indenture, lease and ordinance are all void in that they have the effect of granting to the Trust a (1) franchise without first having submitted the question to a vote of the people and (2) have the effect of granting a franchise for longer than 25 years.

Article 18, Section 5(a), Oklahoma Constitution, provides:

"No municipal corporation shall ever grant, extend, or renew a franchise, without the approval of a majority of the qualified electors residing within its corporate limits, who shall vote thereon at a general or special election; and the legislative body of any such corporation may submit any such matter for approval or disapproval to such electors at any general municipal election, or call a special election for such purpose at any time upon thirty days' notice; and no franchise shall be granted, extended, or renewed for a longer term than twenty-five years."

█ We do not believe that a lessee of a city-owned utility is required to obtain a franchise in order to operate the city-owned public utility within the corporate limits of said city.

Article 18, Section 6, Oklahoma Constitution, authorizes every municipal corporation within the State to engage in any business or enterprise which may be so engaged in by any person, firm, or corporation by virtue of a franchise. It is not contended that the *City* would be required to obtain a franchise to *operate* its own utility.

█ In the third paragraph of the syllabus in City Nat. Bank of Fort Smith, Ark.,

v. Incorporated Town of Kiowa, 104 Okl. 161, 230 P. 894, 39 A.L.R. 206, it was held:

"Property owned and controlled by municipal corporations is of two kinds and characters, viz. (a) That which is owned by and devoted to the use of the municipality as a corporate entity; (b) that which is owned by the municipality but dedicated to the use, service, and benefit of its inhabitants. Property of the first class by the second subdivision of section 4762, Comp.Stat. 1921, may be sold and conveyed by municipal authorities. Property of the second class, acquired by virtue of sec. 27, art. 10, Const., may not be so conveyed free from the public use for which it was acquired and to which it has been actually dedicated, so long as it is suitable or adequate for that purpose and its use has not been abandoned."

In the case now before us the City Council, by the lease, has authorized and empowered its lessee to take possession of a city-owned utility and to operate it in the capacity and for the purposes for which it was designed and dedicated. Under the authority of the cited case it must be used for such purpose. The duty to operate the public utility has been delegated to the Trust.

In Ex parte Houston, 93 Okl.Cr. 26, 224 P.2d 281, 283, the City Council of Oklahoma City was under a contractual duty to provide transportation facilities for airline passengers between its airport and the downtown district of Oklahoma City. It entered into a contract with Airport Limousine Service to perform that duty. It was held therein that the contract with Airport Limousine Service, and the ordinance implementing the same, did not constitute a franchise. In the 7th paragraph by the court it was held:

"When a municipality under legislative authority, Tit. 3 O.S.A. §§ 21–148, and in proprietary capacity, acquires title to and operates an airport terminal, located outside the corporate limits of the city, and by reason of such undertaking and by reason of contract with various airlines using said terminal, is contractually as well as impliedly obligated to provide airline passengers with transportation facilities between said airport and downtown district of municipality, and said municipality contracts with a third party, Airport Limousine Service, to perform such obligation, held: that the contract entered into and the city ordinance implementing the same (No. 6331) did not constitute a franchise."

In the body of the opinion it was said:

"If the airport had been privately owned the City of Oklahoma City as a consequence would have been under no implied or contractual obligation, and if the City had under such circumstances, in its governmental capacity granted a transportation company or individual exclusive use of its streets for transportation of airport passengers to and from the airport, no doubt that would have constituted a franchise and the inhibitions (Art. 18, Sec. 5(a) and 7) urged here by petitioner would apply."

Our Legislature undoubtedly shares our view that a franchise is not necessary when a city-owned utility is operated by a lessee.

In establishing procedure for the sale or lease of municipally-owned utilities, in cities where the sale or lease must be authorized by the qualified voters of such municipality, it is provided in part: (11 O.S.1951 § 442)

"* * * If the highest and best bid made for the sale or lease of such public utility on said date is satisfactory to the governing body of such municipality, then such governing body shall by ordinance call an election for the submission of the question of the proposed sale or lease of such public utility to such highest and best bidder aforesaid, and at the same time shall, by ordinance, call an election for the purpose of submitting the question of

the granting of a franchise to such bidder aforesaid, which said election shall be called for the same day. The *sale* of such utility to be conditioned upon the franchise being granted to such bidder by vote of the people at the election called for such purpose. * * *"

From the emphasized portion of the statute it is clear that a *sale* of such utility is conditioned upon a franchise being granted. The statute does not provide that the *lease* of such property is conditioned upon the franchise being granted.

We conclude that the lessee herein is not required to obtain a franchise from City to operate the facilities now in existence and those authorized to be constructed pursuant to the terms of the lease within the corporate limits of Oklahoma City.

It is further contended that the trust indenture, bond indenture, lease, and ordinances are all void to the extent that they purport to grant to the Trust an exclusive franchise. In this connection the lease provides that the City will not acquire or permit to be acquired or operated any competing facilities, unless such facilities are made a part of the Trust Estate.

Article 18, Section 7, Oklahoma Constitution, provides that no exclusive franchise shall ever be granted. Art. 18, Sec. 6, Const. supra, which gives a municipal corporation the right to engage in any business which may be exercised by others by virtue of a franchise, does not purport to give such municipality (which has constructed and owns a public utility) the exclusive right to operate in that field or area of service.

Article 18, Section 5(b), Oklahoma Constitution, provides in substance that whenever a petition signed by twenty-five percent of the qualified electors of a municipal corporation demanding that a franchise be granted, is filed with the chief executive officer of such municipal corporation, such chief executive officer shall call a special election to submit the question of whether such franchise shall be granted. Since no exclusive franchises may be granted, and since the qualified electors of a municipality are empowered to require the granting of a franchise, we are of the opinion that the lease agreement, insofar as it purports to prevent the franchising of competing sanitary sewer systems and garbage disposal systems is contrary to Art. 18, Sec. 5(b), Oklahoma Constitution.

Intervenor further contends that the trust indenture, bond indenture, lease, and ordinances are void in that these instruments have the effect of surrendering the City's power to regulate the charges for its public sewerage and garbage services.

From our examination of the instruments mentioned, we do not find that the City has, or intends, to surrender its power to regulate the charges for these public services. It is true that the lease and the bond indenture provide that the lessee will fix such rates, fees and charges as will be sufficient to meet interest and reserve requirements, bank and trustees expenses, and other expenses, but the ordinance that approves the lease provides that the trustees will secure the prior approval of the City Council as to the amount of any uniform rate, fee or charge to be imposed by the trustees.

Article 18, Section 7, Oklahoma Constitution, provides that the power to regulate the charges for public services shall not be surrendered. Our attention is not invited to any constitutional or statutory provisions which prevents a city from fixing the rates and charges for services performed by a *city-owned* utility.

Under the provisions of 17 O.S. 1951 § 152, the Corporation Commission is given supervision over all public utilities, with power to fix and establish rates for utility services. However, 17 O.S.1951 § 151, defines public utilities but specifically exempts cities from the definition when such utility is now or hereafter owned, operated, or managed directly or indirectly for public use. In the case before us the utilities are, and will be, owned by Okla-

homa City and will be devoted to a public use. We therefore conclude that the City will have the continued authority to fix the rates and charges for these utility services.

Intervenor further contends that the trust indenture, lease, bond indenture and ordinances constitute a scheme to circumvent Article 10, Sections 26 and 27 of the Oklahoma Constitution, and for that reason are void. This contention has been answered adversely to intervenor by the holding of this court in Morris v. City of Oklahoma City, Okl., 299 P.2d 131. A well established principle is stated and applied in Anderson v. State, 7 Okl.Cr. 130, 123 P. 442, as follows:

"Principles of public policy demand a stable and fixed construction of constitutional law; and that which has been deliberately decided should not be unsettled, unless clearly erroneous."

In Intervenor's fifth proposition it is said that the "trust" method of municipal financing has been demonstrated to be neither politically nor economically sound. The argument in support of that proposition presents problems that should be considered by the people and their legislative bodies, but presents no legal questions for determination by this court.

In plaintiff's proposition four it is stated in substance that the proposed lease agreement and bond indenture, insofar as they bind or commit the City to operate and maintain the leased facilities from other funds, creates a debt and to that extent are void.

In considering this proposition we must first determine whether City funds or Trust funds will be used to finance the City's obligations. The lease agreement, in Article 5A(9), provides that the trustees will fix such rates, fees, costs and rentals, and to charge and collect same through officers of the City, for use of the facilities of the Trust Estate which shall be at all times sufficient in amount to assure that there will be enough annual revenue to meet interest and reserve requirements and to create a

sinking fund to meet principal requirements of the Trustees Bonds, and Bank and Trustees fees and Bank and Trust expenses, in the manner and amount set out in the Bond Indenture securing the payment of the said Trustees Bonds, *and all operation, maintenance, renewal and replacement expenses*. If by this provision the total income of the trust estate is pledged and committed or considered to be held in trust for those purposes, and if no other financial commitments or obligations are imposed upon the City we could hold that this provision in the lease agreement does not violate Art. 10, Sec. 26, Oklahoma Constitution. However, we cannot say that the parties, by their agreements, so intend.

In Article 4 of the lease agreement it is provided that all "surplus revenue" of the trust derived from the operation of the trust estate shall be paid to the City *as rental* to be used by the City *for any lawful purpose*. The term "surplus revenue" is therein defined as all revenues after first remitting to the Bank the sums necessary to meet annual principal, interest and reserve requirements on Trustees Bonds to be issued, including Bank fees and Bank expenses and after paying trustees compensation and trust expenses.

In Article 5, Section 1, of the Bond Indenture it is provided that a special fund will be created and held by the Bank. All revenue and income of the trust estate is to be deposited into this fund daily by the City Treasurer, as treasurer of the Trust. The Bank will hold out a sufficient amount of money from these deposits to satisfy the bond and interest requirements, Bank fees, and trustees expenses, and the Bank will then transfer to the account of the City Treasurer of Oklahoma City the balance of said project fund *"to be used by said City for any lawful corporate purpose."*

In paragraph 6 of plaintiff's amended petition it is alleged that the "surplus revenues" will be turned over to the city *to be used by the city for its general fund purposes*. This allegation is admitted to be true in defendants' answer and cross-petition.

In defendants' brief it is said:

"Plaintiff contends in his amended petition, the City's obligation was a contingent obligation of the City, *since there may be required the application of moneys of the City other than the rentals received from the Trustees which consist of surplus revenues of the sanitary system.*" (Emphasis supplied.)

It will be seen from the lease agreement and bond indenture that the "surplus revenues" or rentals are turned over to the City to be used by the City *for any lawful corporate purposes.* These surplus revenues when turned over to the City are not pledged for operation and maintenance expenses but go into the general fund to be used for any lawful purpose. They lose their identity as Trust funds.

Counsel for plaintiff and defendants apparently assume in their briefs that the "surplus revenues" are pledged and committed to the operation and maintenance of the facilities. This is true when, and if, the trustees take over the complete operation and maintenance of the facilities, but is not true so long as the surplus revenues are turned over to the City to be used by the City for any lawful corporate purposes. The lease agreement and bond indenture do not pledge the surplus revenues, or rentals, to the operation and maintenance of the facilities when they are operated and maintained by the City but the City assumes the broad general obligation of providing these services from any or all of the City's revenues.

 Our Constitution provides that no city shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of three-fifths of the voters thereof, voting at an election, to be held for that purpose. Art. 10, Section 26, Oklahoma Constitution. Section 26 requires municipalities to carry on corporate operations on a cash plan, and invalidates any liability sought to be incurred by contract,

express or implied, executed or executory, in excess of current revenues in hand or legally levied, unless it be authorized by vote of the people. News Dispatch Printing & Audit Co. v. Board of Com'rs of Adair County, 177 Okl. 162, 57 P.2d 1156.

We have recently (1959) in Independent School Dist. No. 1, McIntosh County v. Howard, Okl., 336 P.2d 1097, 1098, quoted with approval from one of our earlier decisions, as follows:

"As was said in Smith v. School Dist. No. 1, Marshall County, 187 Okl. 184, 102 P.2d 131, 135: 'In a variety of cases involving school districts and municipal corporations of various kinds we have been called upon to apply the provisions of Sec. 26, Art. 10, and we have repeatedly held that contracts, executed or executory, entered into in one fiscal year which in any way seek to bind the revenues of a succeeding fiscal year are void.'"

In City of McAlester v. State ex rel. Board of Public Affairs, 195 Okl. 1, 154 P.2d 579, we held:

"A contract entered into between the State Board of Public Affairs and the city of McAlester whereby the former agrees to furnish all work and labor necessary to the construction of an extension of the water system of the city in consideration for water to be furnished at the city's expense to a state institution over a period of years at a specified price per gallon, to be credited against the cost of such work and labor until fully discharged, constitutes a charge against the municipality's funds beyond the current fiscal year, and, in the absence of assent of the voters of said city as provided by section 27, article 10, Constitution, is void."

 Municipal financing is done upon an annual basis. Contracts for payments to be made out of the general funds, to be valid, must be within a legally approved budget, or within the revenues available during the year. Leonard v. City of

Wagoner, 178 Okl. 553, 63 P.2d 93, and In re Bliss, 142 Okl. 1, 285 P. 73.

Since the lease agreement in the instant case does not pledge or commit the surplus revenues when returned to the City to be held or used to meet the financial obligations imposed upon the City, and the City has assumed the broad general obligation of operating and maintaining the facilities from its general fund revenues beyond the current fiscal year, we must conclude that the lease agreement might create a debt or obligation contrary to Sec. 26, Art. 10, Oklahoma Constitution.

We do not mean to say that there is any prohibition against the City making appropriations out of any available money in its general fund from year to year to be expended by the City in the operation and maintenance of these facilities, or retaining an option to do so, but we do hold that this lease agreement might be construed to obligate the general fund revenues of the City, from whatever source, to provide these services for a period of thirty years and that such a commitment or obligation of general fund revenues would be contrary to the provisions of Section 26, Article 10, Oklahoma Constitution.

The issues presented in this case are of a public nature and of importance to the municipalities in this State. For these reasons we have concluded that our holding should be both advisory and directory.

We have found no insurmountable legal obstacles appearing in the lease agreement and bond indenture that would justify the relief prayed for, an injunction to prevent the defendants from proceeding further in the performance and consummation of the objects and purposes therein set forth, conditioned of course that they proceed in accordance with the views herein expressed.

Writ denied.

DAVISON, C. J., and WELCH, HALLEY and JOHNSON, JJ., concur.

BERRY, J., WILLIAMS, V. C. J. and BLACKBIRD and IRWIN, JJ., dissent.

BERRY, Justice (dissenting).

I am unable to agree with the majority opinion.

The Trust is either a legal entity separate and apart from the city or it isn't. If Trust is not a separate legal entity from the city, then the constitutional restraints placed upon a city relative to the manner in which a bonded indebtedness may be incurred are applicable, and being applicable, the financing plan before us clearly violates the Constitution. If the Trust is a separate legal entity, then the city has clearly granted a franchise to Trust in violation of Art. 18, Secs. 5(a) and 7 of the Constitution.

I am of the firm conviction that Trust is a legal entity separate and apart from the city and that a franchise was granted in violation of the cited constitutional provisions.

For the reasons herein stated, I respectfully dissent.

I am authorized to state that WILLIAMS, V. C. J., concurs in the foregoing dissenting view.

Supplemental Opinion on Rehearing.

PER CURIAM.

After our opinion was filed in this case, and pending the filing of petition for rehearing, defendants have entered into and filed in this court a Stipulation in material part, as follows:

" * * * The parties now stipulate and agree that in reference to 'fixing of rates', and in reference to 'surplus revenues', provided for in said documents, the parties intended to contract as follows:

1. That the rates and charges to be fixed by the Trustees of the Trust, and approved by The City of Oklahoma City, shall always be sufficient to assure that there will be enough annual revenues to meet interest and reserve

requirements and to create a sinking fund to meet principal requirements of the Trustees' Bonds, and Bank and Trustees' Fees and Expenses, and all expense of operation, maintenance, renewals, and replacements of the facilities, whether operated by the employees of the City or not.

We further agree in this connection that it would be unlawful and improper for the Trustees to fix or the City to approve rates at a level that would destroy the use of the leased properties and improvements built by the Trustees, or that would impair the ability of the Trustees to meet their financial obligations. It is further agreed, however, that the City would have the right to require the Trustees to reduce rates if they exceed these amounts, and to require the Trustees to raise the rates if deemed desirable by the City.

2. That all of the revenue and income of the trust estate which is to be collected by the City Treasurer, as Treasurer of the Trust, are Trust Funds, or funds of the Trust. That when these funds are deposited in the Bank's special fund they will continue to be funds which are segregated and pledged for the uses and purposes set forth in numerical paragraph No. 1 of this stipulation and agreement.

It was, and is, our further understanding and agreement, that when these so-called 'surplus revenues' are transferred to the account of the City Treasurer of Oklahoma City to be used by said City for any lawful corporate purposes, that such surplus revenues returned to the City Treasurer would continue to be trust funds pledged and obligated in the hands of the City Treasurer in an amount sufficient to meet all operation, maintenance, renewals, and replacements of the facilities, and any other obligations imposed upon the City by the Lease Agreement and Bond Indenture. That in effect these 'surplus revenues' transferred to the City would be held in trust by the City for the use and purpose of meeting the financial obligations imposed upon the City by the Lease Agreement, Bond Indenture and Ordinances, but only to the extent necessary to enable the City to adequately perform its obligations thereunder.

We did not intend in our Lease Agreement, Bond Indenture, and Ordinances, that the City would ever be required or obligated to spend any of its general fund revenues to supplement the 'surplus revenues' in the operation, maintenance, renewals, and replacements of the facilities, but that the 'surplus revenues' only would be pledged in an amount necessary to perform those services. However, the City may from time to time if it so elects appropriate and spend any available general fund money for such purposes.

3. The parties further stipulate that it was their desire that the Court would, in this proceeding, after considering the interpretation thereof contained in this Stipulation, determine that the Lease Agreement, the approving Ordinances of the City, Section 3 of Ordinance No. 8615 of the City and the Bond Indenture are and will be valid and legally binding documents and that bonds issued pursuant to the provisions of said documents and this stipulation will be valid and legally binding obligations of the Trustees in accordance with their terms."

We have considered the Stipulation, the Lease Agreement, Bond Indenture and Ordinances, and have carefully considered the petition for rehearing filed herein, and have concluded that when the Lease Agreement, Bond Indenture, and Ordinances, are given the meaning intended by the contracting parties that the Bonds issued thereunder will be legal and binding obligations in accordance with their terms, and that injunctive relief should be denied.

DAVISON, C. J. and WELCH, HAL-LEY, JOHNSON and JACKSON, JJ., concur.

WILLIAMS, V. C. J. and BLACKBIRD, IRWIN and BERRY, JJ., dissent.