Ex parte HOUSTON.

No. A-11446.   Sept. 27, 1950.

Rehearing Denied Nov. 22, 1950.

(224 P. 2d 281.)

28

Pat Brogan and Schwoerke & Schwoerke, Oklahoma City, and Dixie & Ryan, Houston, Tex., for petitioner.

A. L. Jeffrey, Municipal Counselor, P. J. Demopolos, Asst. Municipal Counselor, and Loyd Benefield, Oklahoma City, amicus curiae, for respondent.

POWELL, J.   This is an original action in habeas corpus instituted by the petitioner, Jack Houston, Jr., for the purpose of securing his release from the city jail of Oklahoma City, where he is confined by reason of a charge filed in the municipal court of Oklahoma City, charging him with the violation of Ordinance No. 6331 of the ordinances of Oklahoma City.   It will be noted that he has not as yet been tried.   This is not an appeal after conviction.   But petitioner alleged that his restraint to answer said charge of violation of said ordinance is unauthorized, and contrary to the laws of Oklahoma in that said ordinance is void, by reason of being unconstitutional.

In the response filed in compliance with rule to show cause issued by this court, L. J. Hilbert, chief of police of Oklahoma City, sets out Ordinance No. 6331, complained of by petitioner, and alleges that the same is valid and constitutional, and prays that the writ applied for be denied.

On the hearing before this court on June 21, 1950, it developed that petitioner had, prior to this action, made application to the district court of Oklahoma county for

writ of habeas corpus and hearing was had before Hon. Baker H. Melone, district judge, on April 14, 1950, and the writ was denied. This is not an appeal from such judgment, as stated by out-of-state counsel representing petitioner, as in this jurisdiction no appeal lies from such a judgment. Ex parte Johnson, 1 Okla. Cr. 414, 98 P. 461; Garrett v. Kerner, 6 Okla. Cr. 47, 115 P. 1027; Ex parte Walters, 92 Okla. Cr. 1, 221 P. 2d 659. But the basis of confinement being the violation of a city ordinance, this court will consider the complaint of petitioner attacking the constitutionality of the ordinance in question, but will limit its inquiry strictly to the jurisdictional question. Ex parte Pappe, 88 Okla. Cr. 166, 201 P. 2d 260; Ex parte Small, 92 Okla. Cr. 101, 221 P. 2d 669. And where the jurisdiction of this court is invoked by habeas corpus to declare void a statute or ordinance, every presumption is indulged in favor of the validity of the statute or ordinance, and this court will not declare such to be void if it can reasonably be sustained. Ex parte Hall, 49 Okla. Cr. 366, 294 P. 823; Ex parte Westellison, 38 Okla. Cr. 207, 259 P. 873; 62 C.J.S., Municipal Corporations, § 208, p. 392.

The parties, at the time this case was argued before this court, submitted the involved ordinance, the city charter of Oklahoma City, 1948, a copy of a certain contract with one R. H. (Bob) White, copy of contract entered into with various airlines using the airport, and stipulated that same were true copies, and stipulated to the introduction in evidence of the testimony of the witnesses on hearing in case No. 122,629, in the district court in Oklahoma county, including the exhibits there received in evidence.

The record develops that the city of Oklahoma City is the owner of a municipal airport known as Will Rogers

Municipal Airfield, located to the southwest and outside the corporate city limits, and immediately west of U. S. Highways Nos. 62 and 277. Exhibits Nos. 4 and 6 are plats drawn to scale showing the airfield and airport facilities, and Exhibit No. 5 is an aerial photograph of the buildings, parking area, driveways, curbs, etc. The airport building faces east and there is a concrete apron both on the east and west of the building; parking is prohibited in an area 50 feet to the north of the center east front of the building, and 50 feet to the south; the curbing there is painted red, however, a 50-foot space at the curbing to the north and a similar space to the south of this area is reserved for parking of airport limousines presently furnished by R. H. (Bob) White, heretofore referred to, by reason of a contract with the city of Oklahoma City dated November 22, 1949. The two reserved spaces will each accommodate three limousines.

The center area to the front or east of the airport building, exclusive of the limousine parking area, is 100 feet by 80 feet, and is entered from the northeast and from the southwest by asphalt half-moon shaped road, 18 feet wide, from U. S. Highways Nos. 62 and 277, which highway is about one block east of the airport building. This area is known as the marquee. There is a parking area adjoining the marquee some 80 feet east of the front of the airport building and a large area to the north and a large area to the south of the marquee for parking by the general public, and taxicabs may park anywhere the general public may park. Limousines, taxicabs and private conveyances may stop in front of the terminal building a sufficient interval to discharge passengers or to pick up passengers, but may not otherwise park. There is also a space reserved for trucks for loading and unload-

ing baggage, express, etc. The city of Oklahoma City owns all of the involved land west of the highway, including the roadway.

The evidence developed that, in October of 1949, taxicab operators began parking their cabs in the prohibited area. The airport manager, Mr. W. G. Nourse, was asked by Mr. Demopolos, respondent's attorney:

"Q. Now, what was the method of their operation at the airport, in other words, what was the condition of the transportation facilities when they began to come out there?"

Over the objection of Mr. Schwoerke, petitioner's attorney, witness was permitted to answer:

"A. Well, it immediately resulted in a very chaotic condition because of the started competition for the passengers, as they came from the planes and through the Terminal Building; there was a dispute and it was necessary that we find some method, some means, of being able to regulate this competition in order to provide safety for the passengers, and also, to keep them from being 'man-handled' or their baggage picked up and the drivers giving them their late arrival in Oklahoma City. Q. Now, what was the condition of the vehicles; what would they do with regard to the front of the building? A. Well, they parked—in the beginning—wherever they could park, immediately in front of the building, double parked, and at various points along the front of that curbed area. Q. Was it true that the entrance to the airport, itself, was blocked? A. To the airport? Q. Well to the marquee? A. It was on several occasions."

On cross-examination by Mr. Schwoerke, witness testified:

"Q. Mr. Nourse, you were familiar with the arrangement whereby the cabs had a certain area there for their parking and what we term 'stands', in the cab business

34

and the limousines had their 'stands', isn't that right? A. Yes, sir. Q. And after you worked that arrangement out, you didn't have this cluttered-up condition there in front of the marquee, so far as vehicular traffic was concerned, isn't that true? A. It broke out intermittently; I wouldn't say that that cured it. * * * Q. And the competition, now, that you said was going on there, was mainly confined, was it not, after we worked it out; our parking arrangement was confined to the entrance-way and the exit of the Airport Terminal, itself, with reference to the passengers? A. That's correct. Q. And the ordinance that would prohibit solicitation of passengers, don't you think, that would have cleared up that siutation? A. I don't know. Q. It would have prevented them bothering the people, as they came out with their luggage, isn't that true? A. That is true. Q. That would eliminate starters, though, and by having them in their places, thereafter, that the limousine had with their proper places there and peace and dignity could have been maintained, couldn't it? A. That's right."

Witness was further asked if the practical effect of the ordinance complained of, if enforced, would not make it so that Mr. White or his limousine service would be the exclusive operator out there, so far as mass transportation was concerned. Witness answered:

"A. Not particularly; the cab service here, at present, enjoy the same privileges that they have over the period of years that the airport has been operating and they are not restricted any more than they have been, at any time. Q. Well, would the cab service, under this Ordinance here, would the cab drivers have an equal chance to pick up the passengers that the limousine service has, we will say, of those that's coming into the Airport? A. I wouldn't say that they would. Q. They wouldn't get over half of them, would they? A. That's right."

Witness was further asked if it was not a fact that the fare of $2.50 charged by taxicabs from Airport to

town would be the same, whether one passenger or five, but witness did not know.

·"* * * Q. Mr. Nourse, the proposition out there has been and is that when an airplane is landing on the runway, that the loud speaker there operating in their Terminal, has announced that there is a limousine ready for them, to take them to town and the limousine fellows are in their position and loads up? A. That's right. Q. And before this ordinance went into effect the other day, do you not know, as a matter of fact, in effect, that the cabs were getting between forty (40%) and fifty (50%) per cent of the passengers out there? A. I don't know that. Q. They were getting enough of the business that Mr. White was beginning to kick about it? * * * A. I couldn't answer that, I don't know. Q. Now, I notice in the contract that you signed with Mr. White, that was in force and effect when this ordinance went in, this 6331, that the contract provided that in consideration of the payment of so much money to the City, that, he would have the exclusive right to maintain a starter out there, then, the City passed this ordinance, in which you have provided that no person, firm or corporation shall solicit patronage for transportation, now, is that the purpose of defining the terms of this ordinance, as far as the starter is concerned? (interrupted — continuing) Now, is that 'starter' there, under this section One, is that they maintain, where they have the right to maintain a 'starter', now, that wasn't considered as soliciting business, was it; that is that right? * * * Q. Is that 'starter' considered as soliciting business? A. No, I wouldn't say that it was because it's contained in an Article that has to do with the space, the legal space, set aside in the lobby where the Limousine Service maintains their telephone system, in order to co-ordinate these schedules which they have between the Airport and the down-town area; I mean, as far as the solicitation of business is concerned, that is not in evidence in this Article. The Court: What are the 'starters'' duties out there; what do they do? A. Well, they maintain a desk, Your Honor, in the lobby and in the corner of the lobby where they have their tele-

phone services for connections between the Airport and the down-town area; in other words, when the Airline gives them the list of passengers to be picked up at the down-town hotels, they have to have some method of coordinating that information and getting the proper number of cars for these hotels, to bring these people to the Airport. The Court: Now, that is the only reason for the legal space or the lobby space that they use? A. It's used—he has an office; it's not the intent of that article of the contract to define a 'starter', as being able to go out and solicit business."

The evidence developed, however, that the "starters" for the Limousine Service had (during the time the Taxi-service had solicitors in the lobby of the Airport Terminal, at least) departed somewhat from dispatcher duties and were actively and busily competing with the taxi "starters" for business.

On direct examination, Mr. Nourse had testified:

"Q. Now, as the manager of the Airport, Mr. Nourse, can you tell the court as to the needs of transportation for the general traveling public at the Airport, what are those needs, if any? * * * A. Any municipality that operates an airport is, more or less, charged with the responsibility of attempting to provide some sort of adequate service of transportation because you must properly provide for the same from Airport to Airport; there has to be an adequate means for the traveling public to get from the Airport to the down-town area and also, from the down-town area back to the Airport; that transportation has to be on a scheduled basis; I mean by that, it must be co-ordinated to work with the flight times of the Airline carriers, both from the standpoint of picking the passengers up from the down-town area and taking them to the Airport in time for the flight, and also, to insure that adequate transportation is available at the Airport for the time of arrival. Q. How many flights, per day, go through this Airport? A. At the present time, we have—approximately—eighty (80) schedules,

consequently, from our operations which means forty (40) flights in and forty (40) out. Q. Is this upon an 'around-the-clock' proposition? A. Twenty-four (24) hours a day. Q. Well, what are your actual needs in regard to these flights? A. Well, the needs, the actual needs are adequate transportation facilities available at the time or near the arrivals, that is, for transportation for the passengers to the down-town area. The needs for the enplaning of passengers, it's necessary to get those passengers out to the Airport in time for the flight and the schedules are set up in such a manner that the passengers arrive there, approximately, ten minutes before flight-time. Q. How far is the Airport from the city proper? A. About seven to eight miles. Q. Mr. Nourse, when you first went to work as Airport Manager. what transportation facilities did you have at the Airport? A. The City had a contract with the Limousine Service. Q. Did you have any taxi-cab stands there, at that time? A. No. Q. Do you know the cost, per passenger, for the Limousine Service? * * * Q. What were the fares charged? A. The fare, at that time, was 75 cents per person. Q. Were the taxi-cabs available? A. They were. Q. And how did the taxi-cabs become available, by call or otherwise? A. By call. Q. Do you know what the fare was for the taxi-cab? * * * A. As I remember, the fare was two dollars and a half to Oklahoma City. Q. Now, can you tell the court what the City did in order to have adequate transportation for the Airport? A. What did the City do? Well, the City entered into a contract with the Limousine Service, by which, the Limousine Service agreed to furnish adequate equipment, suitable equipment and equipment in sufficient numbers to arrange the adequacy of the service at the Airport on a schedule basis."

The petitioner, Jack Houston, Jr., testified that he was a taxi-cab driver for the Yellow Cab Company, and he admitted that on April 3, 1950, at the time of his arrest that he had driven into the area south of the Airport Terminal entrance and had parked in the space re-

served for the Limousines. He denied having solicited passengers. In line with what we stated in the beginning, we would emphasize that whether petitioner actually parked in the area or did not park in the restricted area, or whether or not he solicited passengers, is not a question here. The petitioner has not yet been tried. The sole issue is the constitutionality of the ordinance complained of.

The ordinance in question, and being No. 6331, reads:

"An Ordinance Designating Certain Areas at the Municipal Airport of Oklahoma City as Limousine Stands for the Exclusive Use by Vehicles Operated as Limousines Under Contract with the City; Prohibiting the Parking or Standing of Other Vehicles in Such Areas; Prohibiting the Solicitation of Patronage for Transportation in the Main Airport Building and Within 100 Feet of Said Building; Repealing All Ordinances or Parts of Ordinances in Conflict Herewith; Providing a Penalty for the Violation of the Provisions Hereof.

"Be It Ordained by the Council of the City of Oklahoma City:

"Section 1. The following areas at the Municipal Airport of Oklahoma City are hereby designated at limousine stands for the exclusive use by vehicles operated as limousines under contract with the City;

"(a) From a point 50 feet north of the center of the marquee of the east entrance of the Airport Terminal Building, north 50 feet;

"(b) From a point 50 feet south of the center of the marquee of the east entrance of the Airport Terminal Building, south 50 feet.

"No vehicle other than those operated as limousines under contract with the City shall be parked or permitted to stand in the areas designed above.

"Section 2. No person, firm or corporation shall solicit patronage for transportation inside of the main Airport Terminal Building, nor within 100 feet of said building.

"Section 3. Repeal. All ordinances, or parts of ordinances in conflict herewith are hereby repealed.

"Section 4. Penalty. Any person, firm or corporation who shall violate any of the provisions of this ordinance shall be deemed guilty of an offense, and upon conviction thereof shall be fined not to exceed $19.00 and $1.00 costs.

"Passed by the Council of the City of Oklahoma City, this 28th day of February, 1950.

"Approved by the Mayor of the City of Oklahoma City, this 28th day of February, 1950."

(Duly signed, sealed and attested.)

The contract complained of reads:

"This Contract and Agreement entered into this 22 day of November, 1949, by and between The City of Oklahoma City a municipal corporation, party of the first part, and R. G. (Bob) White, doing business as Airport Limousine Service, party of the second part; Witnesseth:

"Whereas, party of the first part owns and operates the Municipal Airport, located southwest of Oklahoma City, which serves a number of passenger air lines, and desires to obtain adequate transportation service to and from the airport and the City of Oklahoma City to accommodate air line passengers and others; and

"Whereas, party of the second part is engaged in the transportation of persons for hire and desires to obtain the exclusive privilege of furnishing such service from the City to the Airport and from said Airport to the City.

"It Is Therefore Agreed by and between the parties hereto for and in consideration of the mutual covenants and agreements hereinafter contained that:

"1. Party of the first part agrees to provide and furnish space within its terminal building suitable and adequate for the maintenance therein by party of the second part of a desk or counter where a starter, or other personnel, may be installed to carry on the necessary business in operating Airport Limousine Service and White Rent-A-Car Co.

"2. Party of the first part agrees to set aside adequate and suitable space for the parking of vehicles of party of the second part on the premises in connection with the operation of the Municipal Airport. It is understood that the space so set aside by party of the first part will be immediately adjacent to the front of the Municipal Airport Building, and that this space shall be exclusively for the use of second party and not made available to competing transportation services.

"3. It is further agreed by and between the parties hereto that the rights and privileges granted to party of the second part shall be exclusive during the existence of this contract.

"4. It is agreed that party of the second part will have the exclusive right to pick up and deliver incoming and outgoing passengers at the airport and will maintain and operate suitable vehicles on such schedules as to meet the arrival and departure of scheduled aircraft operations operating from the Municipal Airport to provide adequate transportation for hire to and from the Municipal Airport and the City of Oklahoma City. *The foregoing exclusive privilege provisions shall not prevent patrons of the Airport from ordering other individual transportation service to convey them to the Airport and from the Airport, nor prevent other transportation services from rendering such service when specially called or ordered by customers or patrons to render such service.*

"5. It is further agreed that the party of the second part shall pay to the party of the first part the sum of three per cent (3%) per month of the gross in-

come and all moneys due and collected by the party of the second part for the transportation of persons to and from the Municipal Airport, or $150 per month, whichever is the greater. Party of the second part agrees to keep true records and accounts of his operations, which shall be subject to examination and audit by party of the first part, and to make remittance to party of the first part on the 10th day of each and every month for the preceding calendar month during the existence of this contract.

"6. It is further agreed and understood by and between the parties hereto that this agreement shall remain in full force and effect for a period of five (5) years from date, and the party of the second part shall have the option and right to a renewal of the contract for a further period of five (5) years, *provided and upon the condition that, should some third party make a bona fide offer to make and enter into a contract with the first party on a more profitable or acceptable basis to the City, then, and in that event, the second party must agree to and accept a renewal contract on a basis and terms equal to that offered by the third party in order to be entitled to a renewal contract at the expiration of the present one.*" (Italics ours.)

(Properly signed, attested and approved.)

The petitioner advances four grounds to support his contention that both the ordinance and the contract complained of, and above quoted, are void. They are:

1. The contract violates article 18, section 5A of the Oklahoma State Constitution, and Article 18, Section 7, of the Oklahoma State Constitution, which sections prohibit the granting of an exclusive franchise without an election of the qualified electors.

2. This ordinance and contract violates section 4, article 9 of the city charter of Oklahoma City, which provides that all contracts of whatever character involv-

ing an outlay of as much as $300.00 shall not be granted by Oklahoma City without advertising the same for bids and awarding it only to the low bidder of competitive bids submitted.

3. This ordinance and contract violated Title 47, Section 22, 11 O.S.A. which provides that no city or municipality shall ever restrict the free use of the streets and public highways of the State of Oklahoma to all people equally.

4. This ordinance is an improper exercise of the police power of Oklahoma City in that it does not apply equally to all classifications of citizens.

Prior to the adoption of the ordinance in question, the State Legislature in 1947 enacted what is commonly known as the Uniform Airport Act, and being found in Tit. 3 O.S.A. §§ 21 to 148.

Section 61 provides, in part:

"Every municipal corporation within this State shall have the right and power to acquire, own, operate, improve and maintain, within or without the corporate limits of such municipal corporation, real estate, buildings, improvements and facilities for aviation airports and rights of way therefor. For such purposes every municipal corporation shall have the power to exercise the right of eminent domain within or without the corporate limits of such municipal corporation. * * *"

Section 65.2(a) provides:

"Every municipality is authorized, out of any appropriations or other moneys made available for such purpose, to plan, establish, develop, construct, enlarge, improve, maintain, equip, operate, regulate, protect and police airports and air navigation facilities, either * * * within or without the territorial boundaries of this State, including the construction, installation, equipment, main-

tenance and operation at such airports of buildings and other facilities for the servicing of aircraft or for the comfort and accommodation of air travelers, and the purchase and sale of supplies, goods and commodities as an incident to the operation of its airport properties. For such purposes the municipality may use any available property that it may now or hereafter own or control and may, by purchase, gift, devise, lease, eminent domain proceedings or otherwise, acquire property, real or personal, or any interest therein including easements in airport hazards or land outside the boundaries of an airport or airport site as are necessary to permit safe and efficient operation of the airport or to permit the removal, elimination, obstruction-marking or obstruction-lighting of airport hazards or to prevent the establishment of airport hazards."

Section 65.5 provides, in part:

"(a) * * * (1) granting the privilege of using or improving such airport or air navigation facility *or any portion or facility thereof, or space therein for commercial purposes;*

"(2) conferring the privilege of supplying goods, commodities, things, *services or facilities* at such airport or air navigation facility; or

"(3) *making available services to be furnished by the municipality or its agents at such airport or air navigation facility.* In each case the municipality may establish the terms and conditions and fix the charges, rentals or fees for the privileges or services, which shall be reasonable and uniform for the same class of privilege or service and shall be established with due regard to the property and improvements used and the expenses of operation to the municipality." (Italics ours.)

Section 65.8 provides, in part:

"(a) A municipality, which has established or acquired or which may hereafter establish or acquire an airport or air navigation facility, is authorized to adopt,

amend and repeal such reasonable ordinance, resolutions, rules, regulations and orders as it shall deem necessary for the management, government and use of such airport or air navigation facility under its control, whether situated within or without the territorial limits of the municipality. For the enforcement thereof the municipality may, by ordinance or resolution, as may by law be appropriate, appoint airport guards or police, with full police powers, and fix penalties, within the limits prescribed by law, for the violation of the aforesaid ordinances, resolutions, rules, regulations and orders. Said penalties shall be enforced in the same manner in which penalties prescribed by other ordinances, or resolutions of the municipality are enforced. To the extent that an airport or other air navigation facility controlled and operated by a municipality is located outside the territorial limits of the municipality, it shall, subject to Federal and State laws, rules and regulations, be under the jurisdiction and control of the municipality controlling or operating it, and no other municipality shall have any authority to charge or exact a license fee or occupation tax for operations thereon."

Section 65.14 provides:

"A municipality may enter into any contracts or agreements necessary to the execution of the powers granted it, for the purposes provided by this Act." [Sections 65.1-65.22 of this Title.]

At hearing there was submitted for consideration by the court a clause included in all the contracts between the city of Oklahoma City as owner of the Airport Terminal and the various air lines making use of the same, and providing:

"D. *Parking space.* Adequate and clearly designated vehicular parking spaces shall be provided without charge near the Administration Building for the use of Lessee, its employees, messengers, shippers and limousine operators in common with only other air transportation companies having leases similar to this lease."

In considering the issues involved in the within case, we would not overlook that:

"While airports are local in nature, they are part of the national program in respect to financial aid, establishment, and maintenance, to the extent that they perform their function as a part of a unified and nationwide activity." Law of Aviation, Fixel, 3d Ed., p. 176 (The Michie Company).

With the above facts in mind, it becomes necessary to determine whether or not the contract entered into between the city of Oklahoma City and R. G. (Bob) White and heretofore set out, constituted the granting of a franchise. This contract was supplemented by Ordinance No. 6331, above quoted. If a franchise, then there is merit in the petitioner's contention that the contract and ordinance are void as being in violation of certain constitutional provisions, and being article 18, sec. 7, and article 18, sec. 5(a) of the Oklahoma State Constitution, and reading, respectively:

"§ 7. No grant, extension, or renewal of any franchise or other use of the streets, alleys, or other public grounds or ways of any municipality, shall divest the State, or any of its subordinate subdivisions, of their control and regulation of such use and enjoyment.

"Nor shall the power to regulate the charges for public services be surrendered; and no exclusive franchise shall ever be granted."

"§ 5(a). No municipal corporation shall ever grant, extend, or renew a franchise, without the approval of a majority of the qualified electors residing within its corporate limits, who shall vote thereon at a general or special election * * *."

The respondent does not contend that the question of entering into the contract and the passage of the

ordinance was submitted to the qualified electors at an election.

Here the city of Oklahoma City was acting in a proprietary capacity as distinguished from a governmental capacity. This fact is the key to the solution of this case. See City of Mobile v. Lartigue, 1930, 23 Ala. App. 479, 127 So. 257; Coleman v. City of Oakland, 110 Cal. App. 715, 295 P. 59; Dysart v. City of St. Louis, 321 Mo. 514, 11 S. W. 2d 1045, 62 A. L. R. 762; Oklahoma City v. Foster, 118 Okla. 120, 247 P. 80, 47 A. L. R. 822; City of Shawnee v. Roush, 101 Okla. 60, 223 P. 354; Oklahoma City v. Baldwin, 133 Okla. 289, 272 P. 453; City of Sand Springs v. Gray, 182 Okla. 248, 77 P. 2d 56. And from the facts heretofore recited, we find that it owned and was operating the municipal airport terminal under authority of the Uniform Airport Act, supra, and under such authority obligated itself contractually with the various air lines using the airport terminal facilities, to perform certain usual, necessary and incidental services therewith connected. An airport terminal exists for the purpose of handling passengers arriving and departing by air line, and the Will Rogers Municipal Airport being approximately eight miles southwest of downtown Oklahoma Cty, the transportation of passengers to and from the airport to Oklahoma City and looking after their comfort, safety and convenience is the primary responsibility of Oklahoma City as owner and operator of said terminal. To us it appears reasonable that the power to acquire and operate a proprietary function implies all necessary power to operate it efficiently. This thought was advanced in the Florida case of Miami Beach Airline Service v. Crandon, 159 Fla. 504, 32 So. 2d 153, 155, 172 A. L. R. 1425, 1430. And there the court said:

"When a governmental entity is authorized to exercise a power purely proprietary, the law leans to the theory that it has full power to perform it in the same efficient manner as a private person would do."

A necessary auxiliary in the performance of this obligation and service, and considered in the planning and construction of the terminal facilities, was parking space for airport limousines, where they might be available 24 hours a day and on instant call, and to serve passengers on schedule, whether one or more, at a standard rate, regardless of whether the particular trip might or might not be profitable. Also, in accomplishing this duty, a desk or space in the terminal convenient to passengers, with telephone communications with the various air line ticket offices in downtown Oklahoma City, would be necessary. These adjuncts: special parking and the dispatcher or "starter" in the lobby of the airport terminal formed the only exclusive right the Airport Limousine Service had over petitioner or any other person, firm or corporation, and which right involves a function to a large extent determinative of the successful or unsuccessful operation of the terminal. Thus the importance of specific and defined duties to be performed by one responsible person or firm contracting to carry out this obligation, where such duties are delegated by the municipality. Passengers, desiring transportation to the residential sections of Oklahoma City in the absence of personal transportation, would of necessity use the taxi service, and are free to use such service or any other service at their discretion.

The important thing is that in performing its duty the city of Oklahoma City could ill afford to, and it is unthinkable that it would, leave the accomplishment of its implied as well as contractual obligation to the chance

that various taxicab operators would look after the comfort, safety and convenience of the passengers using its terminal. It must be assumed, and the evidence in this case would indicate, that such operators, not under contract, would be interested in only such flights and at such hours that might suit their convenience and that promised to be more profitable. The welfare of the passenger and of the successful operation of the airport would be secondary. The idea is compelling that the contracted service complained of is incidental to the main operation of the airport, is a proprietary function, is authorized by Tit. 3, §§ 65.2(a), 65.5(a) (1, 2, 3), 65.8 and 65.14, O.S.A., and hence the resulting contract and ordinance in question did not constitute a franchise. No franchise being involved the constitutional and statutory restrictions urged do not apply and are irrelevant to the present inquiry.

Petitioner cites the case of Oklahoma Gas & Electric Co. v. Wilson & Co., 146 Okla. 272, 288 P. 316, wherein the term "franchise" is defined, and cites a number of other cases from other jurisdictions that are in accord with the definition given, and it is argued that by reason of the definition of the term "franchise" when applied to the involved ordinance that it comes squarely within the prohibition of Art. XVIII, Sec. 5(a) of the Oklahoma Constitution. We have studied the cases cited, and though the definition of the term "franchise" is broad enough, perhaps, to bring within the definition the ordinance and contract in question by reason of the exclusive features of the contract with the Airport Limousine Service, yet as has been aptly said:

"While it is unquestionably true that, by definition, a franchise is said to be the privilege of using the streets, it does not necessarily follow that the converse is true,

and that any right or privilege to use public streets, regardless of the manner in which it arises or regardless of its purpose, is a franchise." Washington Fruit & Produce Co. v. City of Yakima, 3 Wash. 2d 152, 100 P. 2d 8, 11, 103 P. 2d 1106, 128 A.L.R. 159.

If the airport had been privately owned the city of Oklahoma City as a consequence would have been under no implied or contractual obligation, and if the city had, under such circumstances, in its governmental capacity granted a transportation company or individual exclusive use of its streets for transportation of airport passengers to and from the airport, no doubt that would have constituted a franchise and the inhibitions urged here by petitioner would apply. But such is not the situation in the within case, by reason of the facts recited. The principle in question was involved in the following cases where the contract conferring exclusive rights was held not to constitute a franchise: Washington Fruit & Produce Co. v. City of Yakima, supra; State v. Lovelace, 118 Wash. 50, 203 P. 28; Wallis v. Fidelity & Deposit Co. of Md., 155 Wash. 618, 285 P. 656; City Sanitary Service v. Rausch, 10 Wash. 2d 446, 117 P. 2d 225; Blue Bird Air Service v. City of Chicago, 376 Ill. 272, 33 N.E. 2d 456.

Petitioner herein argues that the case of Miami Beach Airline Service v. Crandon, supra, relied on by respondent, is not here applicable by reason of the fact that the Florida Constitution does not contain a provision as does the Oklahoma Constitution, art. 18, sec. 5(a) and sec. 7, hereinbefore quoted, relating to franchises. But by reason of our conclusion that the contract and ordinance herein involved do not constitute a franchise, and by reason of the facts in that case being so similar to the facts in the within case, the reasoning in the Florida

case is most enlightening and persuasive. There the court said:

"When given authority to do so a governmental entity is expected to perform a proprietary function under like rules and regulations as those pursued by private individuals. No one would contend that a private or a public service corporation would be barred from entering into an exclusive contract like that involved here if the necessities of its business required. When county commissioners are clothed with a proprietary function wherein they are responsible to the public for prompt and efficient service, it necessarily follows that they must be clothed with power to enable them to meet such requirements and we think the act in question does this. * * *

"In State v. Jacksonville Terminal Co., 90 Fla. 721, 106 So. 576, this court was confronted with a question not materially different from that in the case at bar and we there approved a contract on the part of the Terminal Company granting the Jacksonville Baggage Company the exclusive right to conduct its transfer business on the premises of the Terminal Company so long as the privilege was not exercised so as to cause unjust discrimination among passengers. In State v. Wells, 96 Fla. 591, 118 So. 731, 60 A.L.R. 1072, we approved another contract on the part of the Terminal Company granting the Western Union Telegraph Company exclusive right to solicit and handle telegraph messages on the terminal property.

"These contracts were upheld on the theory that the service was accessorial in nature, a service which the Common Carrier is not required by law to perform, that such contracts were not void as contrary to public policy and being so, the grantor of the right was not required to acknowledge claims of rival transfer companies for part of the business or an equal privilege to solicit the business. A similar rule was approved in Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 276 U.S. 518, 48 S. Ct. 404, 72 L. Ed. 681,

57 A.L.R. 426 [and citing cases from various other jurisdictions].

"The right of Common Carrier and Terminal Companies to grant exclusive contracts to solicit patronage at railroad stations has been generally approved throughout the country. See Thompson's Express & Storage Co. v. Mount, 91 N. J. Eq. 497, 111 A. 173, 15 A.L.R. 356, where many cases are cited supporting this rule. The fact that the airport involved in this litigation was owned and operated by the Dade County Port Authority would make no difference in the rule." [159 Fla. 504, 32 So. 2d 155.] See also County Court of Harrison Co. v. West Virginia Air Service, Inc., W. Va. 1948, 54 S.E. 2d 1, and annotation at 172 A.L.R. 1430.

It is the thought of this court that the reasoning in the cases reviewed in the above annotation in 15 A.L.R., commencing at page 356, while involving railway terminals, is all the more applicable to airport terminals, and we would emphasize the desirability for the study of the cases reviewed, as they form the basis for the conclusion reached in the pioneer Florida case above referred to, but we are persuaded in the interest of brevity to simply refer to said annotation where may be found additional and persuasive reasons supporting the Florida case and supporting the conclusions that we have herein reached.

The petitioner next contends that the ordinance and contract violates sec. 4, art. 9 of the city charter of Oklahoma City, which provides, in part:

"All contracts pertaining to public improvements or maintenance of public property, public printing, purchases of supplies and all other contracts upon the part of the city of whatever character involving an outlay of as much as three hundred dollars shall be based upon specifications approved by the Board of Commissioners. * * * Such contracts shall be entered into only after ad-

vertisement not less than three times in a daily newspaper * * * inviting competitive bids. * * *"

We do not think this argument tenable, as in the within case the city of Oklahoma City did not purchase materials, labor or anything, and did not sell any tangible thing, and there was no outlay of any sum of money. There was here involved, as heretofore recited, an implied and contractual duty with which the city was burdened, and which it must perform, regardless of whether profitable or not, as incidental to the successful operation of its air terminal. It contracted with a third party, the Airport Limousine Service, to help it carry out its duty to the airlines and the traveling public, and incidentally was to share in the fares paid to the extent of three per cent of the gross receipts from transporting passengers, or a minimum of $150 per month. The contract was for a period of five years, and the taxpayers of the city were assured of obtaining the maximum benefit by reason of the provision in the contract, heretofore quoted, providing that "should some third party make a bona fide offer to make and enter into a contract with the first party on a more profitable or acceptable basis to the city, then, and in that event, the second party must agree to and accept a renewal contract on a basis and terms equal to that offered by the third party in order to be entitled to a renewal contract at the expiration of the present one."

Even where the municipality contracts to purchase supplies, work and services, whether the contract is to be entered into through private negotiation or only after competitive bidding is a matter of statutory provision and construction. The rule is stated in 43 Am. Jur. § 24, under Public Works and Contracts, as follows:

"In the absence of some controlling constitutional or statutory provision, municipal ordinance, or other legislative requirement, competitive bidding is not an essential prerequisite to the validity of contracts for public works, contracts to furnish materials to public bodies, or other contracts by and with public bodies."

This rule has been approved in Cimarron Utilities Co. v. Guymon, 171 Okla. 344, 43 P. 2d 143.

And where there are statutory or charter provisions requiring competitive bidding, there are well recognized exceptions. For instance, contracts for renting of real property or the hire of chattels generally are not considered within provisions requiring contracts for work, supplies or materials to be let upon competitive bidding. Ambrozich v. City of Eveleth, 200 Minn. 473, 274 N.W. 635, 112 A.L.R. 269. Nor professional services of an engineer, physician, lawyer, artist, etc. The reason for the exception in the first instance is that the location of a particular structure may answer the needs of a municipality, where some other building might not; and where professional and personal services of a specialized nature are required, the municipality may better safeguard the public interest by negotiation rather than competitive bidding, because the low bidder might cause the municipality untold damage and loss. The problem is to contract with individuals who are best qualified to and who give promise of best serving the interest of the municipality and the public.

And while the charter provisions heretofore quoted do not apply to the within case for the reasons stated, and while an alleged intendment to cover an additional field will not be extended by implication, yet it might be pointed out that the general rule is that a city acting in a proprietary capacity may be liable in damages

under imaginable circumstances in handling airport passengers, and while every effort should be made to obtain for the city the best contract possible, in determining what is the best contract, it is suggested there are elements to be considered in addition to the type of equipment, schedules and the percentage from fares to be received by the city, that involve the personal element, and being: the financial responsibility of the limousine contractee, the type, training and discipline of drivers and personnel, interest in promoting air travel, the successful operation of the airport, and interest in the comfort, safety and welfare of the airport passenger.

We must assume that the city officials will see to it that prior to the expiration of the contract that canvass will be made of possible interested parties who might qualify and that others will have opportunity to submit contracts with greater beneficial terms to the city, if a better offer may be submitted. In fact, the petitioner's employer being familiar with the present contract and the date of its expiration may, at some future time, if it otherwise qualifies, be delegated the duty now assumed by the Airport Limousine Service, which formerly was assumed by another. Good business practice would dictate the widest publicity by the city when it may consider other offers in the future for the handling of the airport passengers, but so far as the charter provision in question is concerned, we do not find it applicable to the fact situation here involved.

Petitioner's contention that the contract and ordinance in question violate Tit. 47 O.S.A. § 22.11 which provides in effect that no city or municipality shall ever restrict the free use of the streets and public highways of the state to all the people equally, is not supported

by the facts in the within case for the reason that Ordinance No. 6331 does not prohibit the free use of the half-moon road leading off the U. S. Highways mentioned, and that leads in and out of the airport terminal. It is not, therefore, necessary to determine whether the road in question is or is not a public highway as distinguished from a private one. This road is 18 feet wide and no one is permitted to park in it, including limousines. But no one could complain about that, by reason of the holding by the Supreme Court in Ex parte Duncan, 179 Okla. 355, 65 P. 2d 1015, that:

"The right of the 'free use of the highways' means only such use as is incident to travel, and does not include the right to park."

The restricted parking area herein involved constitutes no part of the roadway in and out of the airport. It is an area constructed for the specific purpose and reserved for airport limousines, much as a drive-in grocery or other store would reserve for its delivery trucks or cars in shopping centers that are springing up in congested areas over the country. Would anyone contend that a merchant could not provide and reserve a private parking space near his business entrance and outside the ingress and egress lanes, and on lands wholly owned by him?

We would emphasize that in the within case no right to occupy or use the streets was made the subject of a specific grant. The rights of the Limousine Company in this respect are limited to and governed by its classification by the State of Oklahoma, and license issued by the state, the same as all operators of motor vehicles. The right to exclusive parking on specific portions of the east apron of the airport terminal exists only as an in-

cident to the contract to transport passengers to and from the airport of the city of Oklahoma City, and will cease to exist whenever the contract for any reason ceases to exist.

It is finally contended that the ordinance is an improper exercise of the police power of Oklahoma City in that petitioner contends that it does not apply equally to all classifications of citizens. Ordinance No. 6331 provides, as we have seen, that no person, firm or corporation shall solicit patronage for transportation inside of the main airport terminal building, nor within 100 feet of the same. However, the contract between the city of Oklahoma City and the Airport Limousine Service permits the Limousine Service to maintain a desk in the lobby of the terminal for telephone communications with the ticket offices of the airlines using the airport and also the loud speaker, maintained by the airlines at the time the passengers deplane on arrival by airline, announces that the Airport Limousines for downtown Oklahoma City are in front of the terminal and ready to depart on being occupied by the passengers. Clearly the Airport Limousine Service is incidentally favored, but legally so by reason of what we have said heretofore.

The evidence in this case shows that prior to the ordinance the taxi drivers attempted to obtain the baggage from passengers, jostled them in instances, and disorder was created by reason of this competition, and that the comfort, safety and convenience of the airport passengers was thereby seriously interfered with, and in fact was the primary reason for the enactment of the ordinance complained of.

Keeping in mind that the Airport Limousine Service was by contract primarily performing an assigned implied and contractual duty that the city of Oklahoma City acting in a proprietary capacity was bound to perform, that the Airport Limousines were of special design and not engaged in the general taxicab business, that the ordinance otherwise applied the same to all taxicab operators, we believe the distinction becomes apparent. Petitioner cites the case of Montgomery v. Oklahoma City, 195 Okla. 312, 157 P. 2d 454, 456, as supporting his contention that the ordinance is an improper exercise of police power. We do not agree that this case supports petitioner's contention. In that case the court declared:

"(3) The police power is very broad and comprehensive and is exercised to promote the health, comfort, safety or welfare of society. Under it, conduct of an individual, and the use of property may be regulated so as to interfere to some extent with the freedom of one and the enjoyment of the other. Ex parte Jacobs, 98 N. Y. 98, 50 Am. Rep. 636.

"(4, 5) Much must necessarily be left to the discretion of the municipal authorities and their acts will not be judicially interfered with unless they are manifestly unreasonable and oppressive, or unwarrantably invade private rights or clearly transcend the powers granted to them. The power of the courts to declare invalid what they term an unreasonable legislative regulation of a business or occupation which the citizenry has a constitutional right to follow although undoubtedly must, from the nature of the power, be exercised with the utmost caution and only when it is clear that the ordinance or law so declared void passes entirely beyond the limits which bound the police power and infringes upon the rights secured by the fundamental law. Dillion on Municipal Corporations, secs. 369-379; Mugler v. State of Kansas, 123 U.S. [623] 661, 8 S. Ct. [273] 297, 31

L. Ed. 205; Barbier v. Connolly, 113 U. S. [27] 31, 5 S. Ct. [357] 359, 28 L. Ed. 923."

And at page 999, Vol. 11, American Jurisprudence, we find this statement:

"The clause of the Fourteenth Amendment forbidding any state to deny to any person within its jurisdiction the equal protection of the law does not limit and was not designed to limit the police power of the state, nor does it affect a proper exercise of such power."

In Ex parte Johnson, 20 Okla. Cr. 66, 201 P. 533, this court said:

"It is for the law-making body of a municipality or for the people themselves, in the exercise of the initiative and referendum, to determine, within the bounds of reason, the necessity or expediency of specific police regulations, subject only to the limitations prescribed by the Constitution and statutes of this state."

This court held in Ex parte Hall, 49 Okla. Cr. 366, 294 P. 823:

"Where a penal ordinance is challenged as being void as unreasonable and beyond a proper exercise of the police power, the courts will indulge every presumption in favor of the validity of the ordinance, and will not declare it void unless it clearly appears that it goes beyond the legislative power."

And see, also, Ex parte Tindall, 102 Okla. 192, 229 P. 125.

By reason of the foregoing, the writ is denied.

JONES, P. J., concurs. BRETT, J., dissents.

On Rehearing.

POWELL, J. In petition for rehearing, counsel urge:

"That said decision is in conflict with an express statute, to which the attention of the Court has not been called in this case, either in brief or oral argument, or which has been overlooked by the Court."

While, as stated, petitioner did not raise in his petition for writ of habeas corpus, the question now interposed, and the same was not by this court directly treated, and ordinarily would not at this time be considered, yet, by reason of the nature of the proceedings and the question being one of first impression in this jurisdiction, comprehensive treatment of the issue is in order, now that it has been urged.

The statutory provision in question is O. S. Supp. 1947, Tit. 3, Sec. 65.16, referred to in the opinion complained of, but not therein quoted. It reads:

"The acquisition of any land or interest therein pursuant to this Act, the planning, acquisition, establishment, development, construction, improvement, maintenance, equipment, operation, regulation, protection and policing of airports and air navigation facilities, including the acquisition or elimination of airport hazards, and the exercise of any other powers herein granted to *municipalities and other public agencies, to be severally or jointly exercised, are hereby declared to be public and governmental functions, exercised for a public purpose, and matters of public necessity;* and in the case of any county, are declared to be county functions and purposes as well as public and governmental; and in the case of any municipality other than a county, are declared to be municipal functions and purposes as well as public and governmental. All lands and other property and privileges acquired and used by or on behalf of any municipality or other public agency in the manner and for the purposes enumerated in this Act shall and are hereby declared to be acquired and used for public and governmental purposes and as a matter of public necessity, and, in the case of a county or municipality, for

county or municipal purposes, respectively." (Italics ours.)

Counsel argue:

"If the above section was not in the Uniform Airport Act, then petitioner would agree with the judgment and decree of the court. This counsel would admit that the logic and reasoning of the court would be good. Also, in the absence of express statutory provision to the contrary, the operation of an airport would as a general rule, be regarded as a proprietary function of a municipal corporation. As the court said in Syllabus 4, it would be similar to a city-owned electric light and power system, or a water system, which operations are usually regarded as proprietary functions of a city."

Also, counsel says:

"Again, assuming that Sec. 65.16 was absent from the Uniform Airport Act, the Florida case, Miami Beach Airline Service v. Crandon, 159 Fla. 504, 32 So. 2d 153, 172 A.L.R. 1425-30, would in all truth be most compelling and persuasive in the case at bar."

An examination of the Florida Statute Annotated, Vol. 13, of Sec. 332.03, F.S.A., Laws 1945, c. 22846, § 3 will disclose that the language of such section is almost identical with the Oklahoma provision, O.S. Supp. 1947, Tit. 3, Sec. 65.16, insofar as declaring the powers to be public, governmental and municipal functions. Therefore, the Florida case, supra, holding that the operation of the Miami Beach Airline Service by the Board of County Commissioners of Dade County, constituted a proprietary function rather than a governmental, is in point and by reason of counsel's concessions affords answer without further treatment, except that comprehensive consideration is indicated for clarification.

We might point out that West Virginia also has a statutory provision, being Article 2A, Chap. 29, Sec. 10,

Code W. Va., Acts 1947, Chap. 12, Sec. 10, which is similar to the Oklahoma and Florida sections. The case of County Court of Harrison County v. West Virginia Air Service, Inc., W. Va., 54 S. E. 2d 1 was cited in support of the authority of a municipality to make exclusive contracts with persons or firms using its airport facilities, and thus supports the action of the respondent herein.

We do not find, however, that the issue now interposed in the within case was raised in either the Miami Beach case or the West Virginia case, above, but respondent calls our attention to two cases, Rhodes v. City of Asheville, 1949, 230 N. C. 134, 52 S. E. 2d 371, and Id., 1949, 230 N.C. 759, 53 S. E. 2d 313, and Granite Oil Securities, Inc., v. Douglas County, Nev. 1950, 219 P. 2d 191, from states having statutory provisions very similar to the Oklahoma provision heretofore quoted, and where the answer depended in each case on whether or not the operation of the airport constituted a governmental function or a proprietary function of the municipality. However, the actions were in tort. And generally it may be said that the distinction between functions of municipalities termed governmental and those termed proprietary, have arisen out of tort actions. This is wholly the case in Oklahoma, so far as we have been able to discover. We reached the conclusion heretofore on consideration of the question, that the operation of an airport by a municipality is a proprietary function. A study of the citations in support of this conclusion is recommended.

There is a further difference in that in the North Carolina case the operation of the airport was joint between two cities or municipalities and a county, while in the Nevada case the operation of the airport was by

a county. In the within case the operation of the airport is strictly by the municipality of Oklahoma City.

Of course, the primary duty of this court is to seek the legislative intent, and to arrive at that intent, the entire statute must be considered, and where such intention can be gathered from an entire statute, words may be modified, altered, or supplied to give the statute the force and effect which the Legislature intended. Also, where the legislative intent is plainly discernible from the provisions of the statute when considered as a whole, the real purpose and intent of the legislative body will prevail over the literal import of the words employed. Keck v. Oklahoma Tax Commission, 188 Okla. 257, 108 P. 2d 162, and see Eagle-Picher Mining & Smelting Co. v. Linthicum, 175 Okla. 483, 53 P. 2d 687. Legislative intent controls in the exposition of statutes, and is to be derived from a view of the whole and every part of the statute, considered together and in light of the general purposes of the Act. Federal Land Bank of Wichita, Kan. v. Howell, 10 Cir., 123 F. 2d 50.

In considering the question raised there are a number of provisions of the Municipal Airport Act, 3 O. S. Supp. § 65.1 et seq., that should be kept in mind, as well as several principles of law adhered to by the Supreme Court of Oklahoma over a long period of time, and that may appear far afield in the solution of the issue raised, but that are nevertheless involved in a clear answer.

By provision contained in the Airport Act of 1947, Sec. 65.15 of Tit. 3 O.S.A., it is, among other things, provided:

"* * * All powers, privileges and authority granted to any municipality by this Act may be exercised and enjoyed jointly with any public agency of this State, and

jointly with any public agency of any other state or of the United States to the extent that the laws of such other state or of the United States permit such joint exercise or enjoyment. If not otherwise authorized by law, any agency of the State government when acting jointly with any municipality, may exercise and enjoy all of the powers, privileges and authority conferred by this Act upon a municipality."

Also by provision of Sec. 65.2(a) we find that the muncipalities of this state are authorized to "plan, establish, develop, construct, enlarge, * * * air navigation facilities, either within or without the territorial limits of such municipality and within or without the territorial boundaries of this State * * *."

It is indicated that the state may acquire and operate an airport separately or jointly with "any municipality or municipalities." Tit. 3 O.S.A. § 137, Laws 1947, p. 26, § 7, and Secs. 75 and 79, Laws 1945, p. 17, § 5, and p. 18 § 9. Also by provision of § 78, O.S.A. Tit. 3, Laws 1945, p. 18, § 8, Oklahoma Aviation Commission, Tit. 3 O.S.A. §§ 71-80, no provision of the act with reference to the Oklahoma Aviation Commission is mandatory upon any municipality of Oklahoma in the acquisition, operation or improvement of its airport.

In harmony with the above is the holding in Oklahoma City v. District Court of Thirteenth Judicial District, 168 Okla. 235, 32 P. 2d 318, 93 A.L.R. 489, that action against municipal corporation created under Oklahoma Laws may be brought in county where cause of action or some part thereof arose, though that county is county other than situs of municipality, since word "corporation" as used in 12 Okla. St. Ann. § 134, regarding venue includes municipal corporations in view of this section.

In Honnold v. Board of Commissioners of Carter County, 1918, 71 Okla. 71, 177 P. 71, 72, the Supreme Court of Oklahoma, after quoting Dillon on Municipal Corporations, 3d Ed., §§ 22, 23, and citing a number of cases, said:

"There is a well-defined and marked distinction between municipal corporations proper and political or quasi corporations. Cities, towns, and villages are municipal corporations proper, while counties, townships, school districts, road districts, and the like are quasi corporations. The difference between these two classes of corporations is well established, and a principle applicable to the one class is not necessarily applicable to the other."

Prior to the Laws 1929, ch. 11, p. 10, § 1, 11 O.S 1941 § 563, Oklahoma had no specific statutory provisions for the establishment of airports by municipal corporations of the state. However, in 1909, in City of Ardmore v. State ex rel. Best, 24 Okla. 862, 104 P. 913, it was held that a pubic park was a "public utility" within the meaning of that term as used in section 27, art 10 of the Constitution of Oklahoma (approving the holding in Barnes v. Hill, 1909, 23 Okla. 207, 99 P. 927), although it has been held by the same court that in the operation of a park the municipality acts in a governmental capacity. And it has been held that condemnation of realty by city for a public park was not invalid because a portion of the park was used for an airport. Fischer v. Oklahoma City, 198 Okla. 22, 174 P. 2d 244, appeal denied 331 U. S. 824, 67 S. Ct. 1315, 91 L. Ed. 1840.

It has been held that under provisions of Art. 18, § 6 of the Constitution of Oklahoma, a city may engage in a strictly business enterprise without being placed in position of exercising governmental function. Inter-

state Power Co. v. City of Cushing, D. C. Okla. 12 F. Supp. 806. And that in view of said provision of the Constitution estimate for airport lease is for "local or municipal purposes." City of Ardmore v. Excise Board of Carter County, 155 Okla. 126, 8 P. 2d 2, 3.

It has also been held that "a public utility", within the meaning of constitutional provision authorizing municipal corporations to incur indebtedness for purpose of constructing public utilities, and the statute authorizing cities of more than two thousand population to own and maintain airports, does not diminish power conferred by the Constitution, 11 O.S. 1941 § 563, O.S. 1941 Const. Art. 10, § 27. Price v. Storms, Board of Trustees, 191 Okla. 410, 130 P. 2d 523.

And in State ex rel. Edwards v. Millar, 1908, 21 Okla. 448, 96 P. 747, 748 it was held:

"Section 27, Art. 10, of the Constitution, is a self-executing grant of power to the qualified property tax-paying voters of a city or town voting at an election held for that purpose, by a majority vote, to become indebted in a larger amount than that specified in Section 26, Art. 10, of the Constitution, for the purpose of purchasing or constructing public utilities, or for repairing the same, to be owned exclusively by such city."

But it has been held that:

"The fact that a city leases a part of an airport, acquired by eminent domain, and facilities to aviation companies * * * does not make the city a public service corporation or common carrier within the purview of sec. 24, Art. II, Constitution of Oklahoma." Fischer v. Oklahoma City, supra [198 Okla. 22, 174 P. 2d 245].

By provision of sec. 14, art. 10 of the Constitution of Oklahoma, funds from taxation may be levied and collected for public purposes only. And in the case of City

of Blackwell v. Lee, 1936, 178 Okla. 338, 62 P. 2d 1219, the Supreme Court of Oklahoma held that the city of Blackwell had authority under provisions of Sec. 6, Art. 18, of the Constitution of Oklahoma, and Sec. 6350, O. S. 1931, Tit. 11 O.S.A. § 563, to operate an airport, and that such operation was for a public purpose, but in its private or corporate capacity, and therefore held the city liable for the negligence of its servants, where airport hangar caught fire and plaintiff's airplane was destroyed. See annotations: 161 A.L.R. pp. 733-764; 120 A.L.R. pp. 1376-1382; 124 A.L.R. pp. 350-359. See text and citations in Fixel on Law of Aviation, 3d Ed., par. 198.

The basis for the holding in the Blackwell case, was the rule announced in the case of City of Sand Springs v. Gray, 182 Okla. 248, 77 P. 2d 56, 57, where the city of Sand Springs maintained a fire department normally recognized as a public and governmental function, but where the city was held liable in damages for negligence of fire truck driver in sideswiping of plaintiff's vehicle while answering a call outside the city limits and where a fee was charged for the call, the court holding that in so doing it was acting in a matter of proprietary interest of the municipality. The court said:

"When a municipal corporation assumes a proprietary power, not for the purpose of governing the people, but rather for the private advantage of the city and its inhabitants as a legal personality, the municipality is not absolved from liability occasioned by failure to carefully perform merely because the exercise of this power relates, in a general way, to a function of government.

\* \* \* \* \* \*

"The basis of the rule contended for by the defendant is the principle that no liability attached to a sov-

ereign state or any of its subdivisions in the exercise of any governmental function.

"The more recent and better considered rule makes plain the line of demarcation, beyond which a municipality is not to be excused from liability. *The test is based upon the nature of the duties with which they are charged.* If for the general good of the public they are considered as being strictly governmental, and in case of negligence in their discharge, no liability can attach. But, if they are duties which do not concern the public as a whole, *but which are for the benefit of the municipality in its private or corporate capacity,* then the municipality must stand ready to accept liability the same as any private individual or corporation." (Italics ours.)

Prior to the Sand Springs case, in City of Shawnee v. Roush, 101 Okla. 60, 223 P. 354, where the city operated a public hospital, normally not for gain and as a governmental function, but where the city did accept paying patients at times, and one such patient was injured through the negligence of attending nurses administering to her during an operation, and where thereafter she filed suit, the Supreme Court held that the function became proprietary in nature by reason of the charges made and that the city was therefore liable in damages for such injuries. See also annotation 101 A. L. R., pp. 1166-1171.

It is believed that it would be at once apparent to anyone after a thoughtful perspective of the relationship of an airport of one state with that of another, of the desirability, even the necessity, if aviation is to properly expand and succeed, for the adoption of uniform airport laws throughout the United States. And where substantially such laws have been so adopted, it is our thought that the courts of the various states should seek a harmonious interpretation of the provisions. See dec-

laration of objectives, § 132, O.S.A. Tit. 3, Laws 1947, p. 24, § 2. In fact, Section 65.20 of the Municipal Airport Act, Tit. 3, Laws 1947, p. 23, § 20, provides:

"Interpretation and construction. This Act shall be so interpreted and construed as to make uniform so far as possible the laws and regulations of this State and other states and of the government of the United States."

Considering first the interpretation of similar language by courts of other jurisdictions, we find that the Supreme Court of North Carolina held in Rhodes v. City of Asheville, supra [230 N. C. 134, 52 S. E. 2d 373]:

"(1) A municipal corporation cannot legally engage in any enterprise in its governmental or proprietary capacity which does not come within the meaning or definition of a public purpose. Nash v. Town of Tarboro, 227 N. C. 283, 42 S. E. 2d 209.

"And even though a municipal activity has been held to be for a public purpose, we may still have difficulty in determining whether such activity is a corporate or proprietary function, and is therefore subject to suits in tort, or a governmental function and immune from such suits. * * *

"(4) The overwhelming weight of authority is to the effect that the construction, operation and maintenance of an airport by a municipality is a proprietary function and such municipality may be held liable in tort for the negligent operation thereof. * * *  [Citing long line of cases.]

"(5) The interpretation we place on the language of the statute upon which the defendants are relying for immunity, leads to the view that it was the intent of the Legislature to declare that the acquisition, construction, operation and maintenance of an airport by a municipality *was a governmental function in the sense that it was a public purpose.* Note the language of the statute: 'The acquisition, establishment, construction, enlargement,

improvement, maintenance \* \* \* and the exercise of any other powers herein granted to municipalities, are hereby declared to be public, governmental and municipal functions exercised for a public purpose and matters of public necessity'." (Italics ours.)

Following the above decision a rehearing was asked, the appellant advancing the contention that the court sought to interpret the section in question when it was plain and required no interpretation, and the court in Rhodes v. Asheville, 1949, 230 N. C. 759, 53 S. E. 2d 313, held:

"On their petition for rehearing the defendants contend that the one question presented on the appeal was as to the effect of the language used in the Act under which the Asheville-Hendersonville Airport Authority was created, to-wit: 'The acquisition, establishment, construction, enlargement, improvement, maintenance \* \* \* and the exercise of any other powers herein granted to municipalities, are hereby declared to be public, governmental and municipal functions, exercised for a public purpose and matters of public necessity.' They contend that this is plain, unambiguous language which does not call for interpretation, and that none was sought, either by the appellee or the appellants. The petition for rehearing is based on the assumption that the Court misapprehended the question presented and proceeded to construe the language rather than to give it the force and effect plainly intended by the Legislature."

"Unquestionably the Legislature intended to declare that the operation of the Asheville-Hendersonville Airport should be deemed and held to be in furtherance of a governmental function. But the mere legislative declaration to that effect did not make it so, for that is a judicial and not a legislative question. On consideration of the question as presented on the appeal, we were compelled, for the reasons there stated, to conclude that the operation of the airport is a proprietary undertaking.

"We cannot attribute to the language used the force and effect urged by appellants. Instead, we must construe it in such manner as to bring it within the legislative authority of the General Assembly and make it consistent with the validity of the statute in which it is used. This is in accord with the applicable rule of construction."

The Supreme Court of Nevada in June, 1950, in Granite Oil Securities, Inc., v. Douglas County, 219 P. 2d 191, 197, above referred to, had occasion to construe its airport statute, N.C.L. 1929, §§ 289-293, Laws 1947, c. 215, § 24, which, as indicated, contains provisions practically identical with the Oklahoma Statute, heretofore quoted. There the plaintiff sued Douglas County alleging that its negligence had caused destruction of plaintiff's aircraft by fire at the airport owned by Douglas County. A demurrer was interposed and presented on the theory that the county was acting, by the very wording of the statute, under a governmental capacity and was therefore not liable in tort. The demurrer was sustained and an appeal followed. The Nevada court said:

"Respondent contends that the very wording of the 1947 act declaring that the operation of the airport should be deemed to be in furtherance of a public and governmental function is a declaration of sovereign immunity. Replying to a similar contention the Supreme Court of North Carolina on rehearing in Rhodes v. City of Asheville, 230 N. C. 759, 53 S. E. 2d 313, said:

" 'We cannot attribute to the language used the force and effect urged by appellants. Instead, we must construe it in such manner as to bring it within the legislative authority of the General Assembly and make it consistent with the validity of the statute in which it is used. This is in accord with the applicable rule of construction.'

"Such rule of construction has been enunciated on many occasions by this court. *The reference to the ap-*

*parent purpose of the declaration that airport operation is a public and governmental function as being to support the validity of the statute, is undoubtedly directed to the general rule restricting the activities of counies to public and governmental purposes as subdivisions of the state. Like the North Carolina court, we believe the declaration to be simply in justification of the powers granted.* As applied to statutes creating municipal corporations, each of the three separate opinions of the justices of this court in Pardini v. City of Reno, 50 Nev. 392, 263 P. 768, recognized the rule that exemption from liability cannot be claimed unless it is clearly and expressly given. In this view we find it unnecessary, for the purposes of this case, to adopt the further holding of the North Carolina court that the determination of what is or what is not a governmental function is a judicial question which can in no event be determined by the legislature." (Italics ours.)

In the within case from what we have set out above, we find that it has been held that independent of statute, the municipalities of Oklahoma by provision of section 27 of article 10 of the Constitution, which has been held to be self-executing, have authority to purchase, construct, maintain and repair public utilities, and that an airport is held to be a public utility, is for a public use, and is proprietary in nature as distinguished from governmental, and that a municipal corporation possesses the right to condemnation of lands for airport purposes; that the first specific airport legislative provision was the amendatory act of 1929, Laws 1929, ch. 11, p. 10, § 1, Tit. 11 O.S.A. § 563, and at this time the current and comprehensive statutory provisions as set out in Tit. 3 O.S.A. §§ 21 to 148, inclusive, include section 65.16 which we are called on herein to interpret in connection with the other provisions of the Act.

We find the provisions of the 1947 laws covering municipal airports in harmony with the prior unrepealed legislative provisions covering the subject, as well as in harmony with the prior judicial construction of prior legislative provisions and the Constitutional provisions, as concerns the nature of the function of the municipality in the acquiring, construction and operation of airport facilities in the sense of being proprietary as distinguished from governmental, unless it was the intention of the Legislature by words contained in Section 65.16 supra, quoted, to make such functions "governmental". Such construction would be out of harmony with other legislative provisions and principles adhered to by the Supreme Court since statehood. To interpret the Act as contended for would be to hold unconstitutional the city ordinance complained of, and therefore hold void the contract between respondent and Limousine Service. And would also and incidentally relieve the State, all counties and all municipalities of Oklahoma from liability for injuries resulting from malfeasance or nonfeasance connected with the operation of an airport owned by one or more divisions, in the face of the general rule that municipalities cannot be so exempted except by specific legislation so saying. The general traveling public as well as laborers who might become injured while employed in the construction, repair or operation of municipal airports thus might have no redress.

And if it was the intent of the Legislature to abrogate what has heretofore been recognized as the settled law of this jurisdiction, and which is adhered to by most states of the Union, then should an Oklahoma municipality co-operate with a municipality of a sister state in acquiring and operating an airport, as authorized by the 1947 Act, with one treating the functions governmental

and the other proprietary and with no deference to the settled general rule of construction in the United States, the complications are at once apparent.

We cannot believe such to be the legislative intent. Rather, we would heed the admonitions of the provisions of Section 65.20 of the Act and so interpret and construe the Act as to make it "uniform with the laws and regulations of this State and other states and the government of the United States having to do with the subject of municipal airports."

We therefore approve the interpretation of similar statutory provisions by the Supreme Court of North Carolina and by the Supreme Court of Nevada. We cannot attribute to the language used the force and effect urged by petitioner. Instead, we must construe it in such manner as to bring it within the legislative authority and make it consistent with the validity of the statute in which it is used. The apparent purpose of the Legislature in declaring that airport operation is a public and governmental function is directed to the powers granted counties and the general rule restricting activities of counties to public and governmental purposes as subdivisions of the State. Like the North Carolina and Nevada courts, we believe the declaration to be simply in justification of the powers granted, and justifying the powers of condemnation and the police powers, and so far as the function authorized is concerned, erasing all technical distinctions between counties, cites, towns and authorities designated in the Act, and that it was the intent of the Legislature to declare that the occupation, construction, operation and maintenance of an airport by a municipality was a governmental function in the sense that it was a public purpose, thus bringing the Act

within the constitutional provisions. Const. Art. 10, § 14.

We find it unnecessary for the purpose of determination of petitioner's right to a writ of habeas corpus, to treat incidental questions where such treatment is not absolutely necessary for a solution of the main problem, and we therefore refrain from adopting the further holding of the North Carolina court that the determination of what is or is not a governmental function is a judicial question which can in no event be determined by the legislature.[1]

The petition is denied.

JONES, P. J., and BRETT, J., concur.

BRETT, J. (concurring). After mature consideration and study I am led to agree that the legal conclusions arrived at by associate Judge POWELL are eminently correct. This member of the Court is now satisfied with the majority's conclusion that the exclusive right granted to R. G. (Bob) White, doing business as the Airport Limousine Service, is not a franchise. It is not a franchise since the exclusive right granted the Airport Limousine Service does not entail the use of or infringement of any public streets or highways or municipal facilities provided by the city, in the exercise of its governmental functions. To the contrary, as clearly pointed out in Judge POWELL'S opinion, the premises covered in the exclusive contract with White do not constitute a part of the streets and highways or

---

1. In Wallis v. Fidelity & Deposit Company of Maryland, 155 Wash. 618, 285 P. 656, where this principle involved, held: "Fact that ordinance granting exclusive privilege of handling garbage in city and bond securing faithful performance of contract denominated right to handle garbage as franchise, under Rem. Comp. Stat. § 9125, held not to make such right a franchise unless it is one in fact." As Shakespeare observed over five hundred years ago, "a rose by any other name would smell as sweet."

facilities provided by the city in its governmental capacity, but are part and parcel of the airport premises being operated not in its governmental but in its proprietary capacity. Being so constituted and operated, the city had the power to make the contract with White just as any other corporation or individual would if operating in a proprietary capacity. Hence the contract is not in violation of the provisions of Art. XVIII, §§ 5(a), 7, in relation to granting franchises. Had the situation involved the use of governmental facilities such as use of streets and highways the right invoked would constitute a franchise and the right of the use could only emanate from the sovereign power or by a vote of the people in the municipality under the provisions of Art. XVIII, §§ 5(a), 7, but such is not the situation herein involved. The contract herein involved and the Oklahoma City Ordinance No. 6331, enacted to enforce the provisions of the contract made with White granting him exclusive parking privileges on the airport facilities clearly fall within the provisions of the Airport Act, O.S. Supp. 1947 Title 3, § 65.1, etc., conferring upon cities the right to act in their proprietary capacity in the establishment of airport facilities as distinguished from their governmental functions, to acquire, maintain, operate and prescribe rules and regulations for the maintenance and operation of such airport facilities and since the powers so exercised are proprietary and not governmental the same are not in violation of the constitutional provisions hereinbefore referred to. Moreover, they are matters of legislative concern. In this regard, this Court has said in Ex parte Strauch, 80 Okla. Cr. 89, 157 P. 2d 201, 203:

"The Legislature and not the courts must determine the policy of the state to be voiced in statutory enact-

ments. Legislative power, not wisdom, is the concern of the courts." Such is the situation herein involved.

Petitioner in his petition for rehearing says if it were not for the provisions of O.S. Supp. 1947, Title 3, § 65.16, "this counsel would admit the logic and reasoning of the court was good". By this admission the petitioner strips himself of his entire argument. One need only read the logic and reasoning of the Court in the opinion on rehearing to be so convinced. The last referred to section declares the powers under the airport act to be public, governmental and municipal functions. Judge POWELL clearly demonstrates in his opinion that the mere fact of definition does not make them such. Hence the writer concurs with associate Judge POWELL'S conclusion that "what is or is not a governmental function is a judicial question which can in no event be determined by the legislature". To hold with the petitioner's contention that the legislative act under which the city derives its airport powers, defines the operations as governmental and that such definition binds the city and the courts, would be to ignore the fact that the operation is proprietary, and hence would jeopardize the greater rights of all of society to seek redress for negligence in the operation of such airport facilities which are proprietary in fact and only because of which fact are they required to answer in damages for negligent operation of same. No such legislative fiction should or will be permitted to interfere with the right of redress in the general public including all of labor such as carpenters, masons and others performing services in and about the airport for tortious wrongs, where the operation is in fact proprietary and not governmental.

It is not necessary for the writer to consider the other propositions presented by the petitioner since they

constitute no obstacle to his concurrence in the original opinion heretofore rendered. Having become satisfied on the two propositions herein discussed and being convinced that associate Judge POWELL is eminently correct in his conclusions, the writer hereby authorizes the withdrawal of his dissent and on rehearing concurs both in the original and the opinion herein on rehearing.